**PEOPLE OF the STATE OF ILLINOIS, Illinois Commerce Commission, Pulaski County, Alexander County, Perks Grain Company, C. L. Casper, and John W. McGinness, Petitioners,**

**Cairo Chamber of Commerce, the Southern Illinois Transportation Association, and the City of Cairo, Intervenors,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Missouri Pacific Railroad Company, Intervenor-Respondent.**

**Nos. 78–1710, 80–1908.**

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1981.

Decided Oct. 5, 1981.

Certiorari Denied March 8, 1982.

See 102 S.Ct. 1631.

Gordon P. MacDougall, Washington, D. C., Edward Charles Spatz, Anitea Foam Corp., Bremen, Ind., for petitioner.

Sidney L. Strickland, Jr., I.C.C., Washington, D. C., James H. Durkin, Mo. Pacific Railroad Co., Chicago, Ill., for respondents.

Before SPRECHER and CUDAHY, Circuit Judges, and EAST,* Senior District Judge.

CUDAHY, Circuit Judge.

Petitioners[1] seek review of an I.C.C. Decision permitting the Missouri Pacific Railroad ("MoPac") to abandon 25.7 miles of railroad in southern Illinois. The Administrative Law Judge ("ALJ") initially denied the abandonment application.[2] A panel of the I.C.C. disagreed and issued a Report and Order approving the abandonment.[3] On appeal by way of a petition to review the I.C.C.'s order, this court permitted a voluntary remand to the full I.C.C. for further consideration. The subsequent Decision of the full Commission,[4] which also approved the abandonment, is now before this court for review of: 1) Whether the I.C.C. erred as a matter of law about the effect on the abandonment of certain prior conditions imposed by the I.C.C. incident to a prior MoPac merger, 2) Whether the I.C.C. findings of fact are supported by substantial evidence, and 3) Whether this court has jurisdiction to review an I.C.C. decision to withhold certain documents under the Freedom of Information Act. For

---

* The Honorable William J. East, Senior District Judge for the District of Oregon, is sitting by designation.

1. Petitioners are the People of the State of Illinois, Illinois Commerce Commission, Pulaski County, Alexander County, Tammsco, Inc., Perks Grain Company, C. L. Casper (a private citizen), and John W. McGinness (for the United Transportation Union). The City of Cairo, Cairo Chamber of Commerce and Southern Illinois Transportation Association are intervening petitioners. Respondents are the Interstate Commerce Commission and the United States of America. Missouri Pacific Railroad is an intervening respondent.

2. I.C.C. Docket No. AB–11, *Chicago and Eastern Illinois Railroad Company Abandonment,* (Initial Decision, October 26, 1973) (unpublished).

3. I.C.C. Docket No. AB–11, *Chicago and Eastern Illinois Railroad Company Abandonment,* (Report and Order, March 24, 1978) 354 I.C.C. 789 (1978).

4. I.C.C. Docket No. AB–11, *Chicago and Eastern Illinois Railroad Company Abandonment,* (Decision, April 21, 1980) (unpublished).

the reasons stated below, we deny the petition challenging the I.C.C.'s decision of April 21, 1980.

## I. Facts

In 1967, a hotly contested battle for stock ownership of the Chicago & Eastern Railroad ("Eastern") was resolved when the Supreme Court upheld the I.C.C.'s award of conditional purchase authority to MoPac rather than to the competing Illinois Central Gulf Railroad ("IC") in the "Control case".[5] Shortly thereafter, Eastern acquired trackage rights over a MoPac line, permitting through traffic to be routed around the 25.7 miles of track at issue in this case. In 1972, Eastern filed to abandon this track but the hearing was enjoined until the I.C.C. could include an environmental impact study in its deliberations.[6] Due to the staleness of the record, a de novo hearing was scheduled for June 3, 1976. Eastern petitioned for reconsideration, arguing that the record was adequate to dispose of the issues. The I.C.C. granted the petition, cancelled the de novo hearing, and, on April 21, 1976, released the ALJ's Initial Decision denying the abandonment.[7]

The Initial Decision suggested that the decline in rail traffic on the line was at least partially attributable to Eastern's shortage of railroad equipment. Further, rerouting traffic over the MoPac line was found to have contributed to the financial losses on the line. Finally, the ALJ held that the I.C.C.-imposed conditions in the Control case conflicted with the proposed abandonment.

Eastern filed exceptions to the adverse decision, and the I.C.C. reopened the proceeding under a modified procedure whereby written evidence is submitted to update the record. Shortly thereafter, Eastern was merged into MoPac,[8] and the relevant conditions imposed in the Control case were continued.[9] After the I.C.C. reopened the abandonment proceeding, MoPac was substituted for Eastern as the petitioner. On March 24, 1978, an I.C.C. panel released its Report and Order.

The Report and Order approved the 25.7 mile abandonment. The I.C.C. panel found that the railroad was sustaining losses in providing service over the line and that traffic was declining. Further, the panel found that appellant Tammsco, Inc., the largest shipper along the line, could find alternate rail service. Finally, the I.C.C. stated:

We turn now to the two factors the Administrative Law Judge found decisive. Neither supports a denial of the abandonment application. First, there is no basis for the assumption that, if additional equipment were available, the line would

---

5. *Illinois Central R.R. v. United States*, 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1966). The conditions imposed by the I.C.C. are known as DT&I conditions—so called because their origin is traced to *Detroit, Toledo and Ironton R.R.*, 275 I.C.C. 455 (1950). Particularly at issue are the following:

 1. Under control of Missouri Pacific, Eastern shall maintain and keep open all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by the Commission.

 2. The present neutrality of handling traffic inbound and outbound and in overhead service by Eastern shall be continued so as to permit equal opportunity for service to and from all lines reaching the rails of Eastern without discrimination in the arrangements of schedules or otherwise.

*Missouri Pac. R.R.—Control—Chicago & E.I. R.R.*, 327 I.C.C. 279 (1965), *petition for review denied, Illinois Central R.R. v. United States*, 263 F.Supp. 421 (N.D.Ill.1966) (three-judge court), *aff'd*, 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967). These conditions have been uniformly imposed on railroad control and merger cases until recently. *See Missouri-Kansas-Texas R.R. v. United States*, 632 F.2d 392, 404 (5th Cir. 1980).

6. The environmental evaluation was required under section 102(2)(c) of the National Environmental Policy Act of 1969, 42 U.S.C. 4321, *et seq. See Harlem Valley Transportation Ass'n v. Stafford*, 360 F.Supp. 1057 (S.D.N.Y.1973), *aff'd*, 500 F.2d 328 (2d Cir. 1974).

7. Interestingly, the court-ordered environmental impact statement was completed by the I.C.C. in 1976, but ALJ Thomas Callanan, who wrote the Initial Decision, died in 1974.

8. *MoPac—Merger—T&P and C&EI*, 348 I.C.C. 414 (1976) ("*Merger* case").

9. *Id.* at 415–16.

generate substantially more traffic. Secondly, our approval of the MoPac-C&EI merger, without specific routing conditions, served to eliminate the two restrictions which the Administrative Law Judge felt had been violated.

354 I.C.C. at 796. The Report and Order of March 24, 1978, concluded that the adverse effect on shippers did not outweigh the carrier's burden, and therefore, that the abandonment of the 25.7 mile line should be granted. After petitions for administrative review were denied, an appeal to this court was terminated by a voluntary remand to the I.C.C. to correct material error and receive further evidence.

A divided Commission again approved the abandonment in the April 21, 1980, Decision of the full I.C.C. The carrier's losses were recalculated under a new accounting procedure. The potential for future increases in traffic from petitioner-appellant Tammsco, Inc. was also considered and found to be too speculative "to support the conclusion that there is a reasonable likelihood of future traffic increases eliminating the existing operating deficit being incurred by the line."[10]. Finally, with regard to the merger conditions, the I.C.C. explained:

> We have considered the parties' arguments regarding the effect of the traffic conditions imposed in the *Merger* case and conclude that those conditions have no relevance to the issues in this proceeding. The traffic conditions imposed in the *Merger* case (known as standard DT&I conditions) are designed to protect the interests of connecting railroads. These conditions require that gateways and junctions with connecting lines be kept open and that neutrality of handling inbound and outbound traffic be observed. These conditions do not apply to a railroad's routing of traffic over its own lines through its internal gateways. Use of an alternate route for bridge [or through] traffic is a matter of managerial discretion. *Missouri Pac. R. Co. Abandonment,* 324 I.C.C. 357, 366 (1965). Further, continued operation of a line should

not be required merely because of bridge traffic that can be handled as expeditiously over another route. *Gainesville Midland R. Co. Abandonment,* 267 I.C.C. 256, 262 (1947).

> At the time the traffic conditions were originally imposed in the Control case, the involved C&EI line connected with MoPac and connected with ICG at Tamms. In 1975, ICG discontinued the interchange at Tamms. After approval of the MoPac-CE&I merger in the *Merger* case, the MoPac-CE&I gateways became MoPac internal gateways. Therefore, although the *Merger* case continued to impose the standard DT&I conditions, these conditions are not relevant to operations over the abandonment segment because alternate MoPac routes are available which can handle bridge traffic with equal or greater efficiency and economy. MoPac's decision in late 1976, to start routing bridge traffic over other MoPac routes was a proper exercise of managerial discretion and did not violate the traffic conditions.

I.C.C. Decision at 9–10.

Since the I.C.C. Decision, a petition to reopen the abandonment was denied in 1980. A petition for review by this court was filed and the matter argued on June 1, 1981. After briefing, but prior to the argument, petitioners filed a motion to have the I.C.C. reopen the proceedings in light of further developments. The I.C.C. refused to reopen the abandonment proceedings on July 24, 1981.

## II. *Conditions*

Petitioners contend that conditions created in the *Control* case, and continued in the *Merger* case, prohibit abandonment "as a matter of law." Of particular concern are the two conditions on which the ALJ relied in his Initial Decision. The first such condition was that Eastern and MoPac must maintain and keep open all routes via existing junctions and gateways. The second condition required Eastern and MoPac to observe neutrality in handling inbound, out-

10. I.C.C. Decision at 9.

bound and overhead traffic. Essentially, petitioners' argue that a railroad is foreclosed from abandoning a line when it is required to "keep open all routes." [11] Presumably, petitioners would have the I.C.C. institute proceedings to remove the conditions before undertaking any abandonment proceedings.

Respondents note that the ALJ's Initial Decision to this effect was overturned by the full I.C.C. The full I.C.C. concluded in its 1980 Decision that the conditions attached to the merger as contended by petitioners but that they did not have the effect of prohibiting the abandonment.[12] Respondents have adopted the position of the full I.C.C. Decision.

The instant case appears to be the first by a federal court to consider the relationship of an I.C.C.-imposed merger condition to a subsequent abandonment. We conclude that petitioners have misconstrued the purpose of the conditions, and, in so doing, have failed to show that this abandonment is controlled by these conditions.

The specific conditions created by the I.C.C. in the instant case do not *per se* limit or constrain an abandonment. In the instant case and in others, the I.C.C. has construed the scope of the DT&I conditions in such a way as not to automatically preclude a subsequent abandonment. For example, in *Chicago and N.W. Ry.—Purchase —Minneapolis & St. L. Ry.*, 312 I.C.C. 285, 295 (1960), the I.C.C. declined to add a requested condition prohibiting subsequent abandonments, noting: " . . . the merits of any future proposal of such nature [an abandonment] must be reserved for consideration in a proceeding for which such authority is sought."

The I.C.C.'s position that subsequent abandonment proceedings must be considered on their own merits without regard

to prior merger conditions has considerable support in the relevant statutory provisions. The I.C.C. may impose "just and reasonable" conditions before approving a merger between two railroads, when the conditions are necessary to protect the public interest. The statute provides that the commission shall consider at least:

(1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.

49 U.S.C. § 5(2)(c) (1976) [recodified at 49 U.S.C. § 11344(b) (1978)]. The DT&I conditions are designed to restrain the kind of anti-competitive commercial conduct that might arise from an acquisition or merger. *Kansas City Southern Ry. v. United States*, 288 F.Supp. 742, 747–48 (W.D.Mo.1968). In the instant case, the I.C.C.'s intent is evident. The *Control* case itself states that the conditions "will provide just and reasonable limitations upon the ability of Missouri Pacific and Eastern to favor selected routes and gateways or to vary the degree of cooperation with the [intervenor railroads] in regard to schedules, interchanges of freight, or other arrangements." *Control*, 327 I.C.C. at 309. Both here and in general, the I.C.C.'s intention is to restrain anti-competitive conduct.

 A decision to allow an abandonment, in contrast, requires an assessment of whether the "public convenience and necessity" permits the abandonment. *See Colorado v. United States*, 271 U.S. 153, 164, 46 S.Ct. 452, 454, 70 L.Ed. 878 (1962). Various criteria are involved in the abandonment decision including, *inter alia*, the potential

11. Relying on the language of the Initial Decision, petitioners concur in the ALJ's assessment that "[f]rom the record established here, one cannot help but to [sic] conclude that these two mandatory restrictions would have to be ignored if the applications [for abandonment] were granted." Initial Decision at 6–7.

12. In the Report and Order, the I.C.C. panel had held in 1978 that the conditions created in the *Control* case were extinguished by the *Merger* case. The subsequent interpretation of the conditions by the full I.C.C. reflects, in part, the "material error" that caused the I.C.C. to seek a remand from this court of the initial petition for review.

impact on shippers and the surrounding community and the costs of continued operations to the railroad. We believe that anti-competitive factors should be considered in approving abandonments. But, although an anti-competitive effect of the type barred by the DT&I conditions may be one factor relevant to the overall abandonment decision, it does not follow that such an effect would necessarily have a sufficient negative impact on public convenience and necessity to require the rejection of an abandonment. The existence of a condition that a railroad must "keep open all routes" does not *per se* prohibit an abandonment.

■ Nor have the petitioners shown how the abandonment of the 25.7 mile line segment would, under the facts of the instant case, adversely affect the competitive posture of any other carrier. The public notice given for this proposed abandonment has not prompted any other railroad to assert that the abandonment would have anti-competitive consequences in violation of one

of the merger conditions.[13] Further there has not been a sufficient showing of anti-competitive injury to the shippers on the 25.7 mile line related to any indirect benefits provided to them by the anti-competitive conditions. Petitioners have adduced no evidence to show that there is an actual conflict between the purpose sought to be achieved by the conditions and the consequences of the abandonment.[14]

■ We therefore think that the I.C.C. correctly ruled that the DT&I conditions do not prohibit, as a matter of law, the abandonment of the 25.7 mile segment of MoPac track in question.[15] Further, on the facts before us, we believe that the proposed abandonment will not have an anti-competitive effect violative of the conditions.[16]

## III. I.C.C. Report

### 1. Scope of Review

Petitioners also contend that the I.C.C.'s conclusions are based on findings not supported by substantial evidence. While both

13. Presumably the IC, which litigated the *Control* case to the Supreme Court, would have the greatest interest in the integrity of the conditions imposed, in part, for its protection. Because the IC declined an opportunity to participate in this proceeding, we question how the 25.7 mile abandonment would have any impact on the protection afforded to the IC by the conditions.

14. Essentially, we think the I.C.C.'s construction of its own merger conditions is entitled to great weight in a subsequent abandonment proceeding because the I.C.C. imposed the merger conditions in the first instance. Because the I.C.C.'s construction of the conditions does not prohibit the abandonment in question, we do not need to consider whether, in general, a condition can be created which would limit MoPac's right to proceed under the abandonment statutes.

15. Petitioners have raised several other arguments that are ultimately premised on the assumption that the DT&I conditions preclude this abandonment. For example, it is alleged that a pre-abandonment trackage rights agreement improperly voided the conditions and that abandonment of this "main line" of the predecessor Eastern system is barred by control conditions designed to preserve Eastern's main lines. But these alleged violations of the conditions are insufficient to block this abandonment.

Petitioners have also argued that MoPac and Eastern should not have been able to reroute through traffic off of this line to other MoPac lines under the DT&I conditions. Petitioners claim that the rerouting has improperly skewed all of the financial data relevant to the costs and revenues attributable to the line. The conditions do not pertain to a railroad's neutral managerial decisions as to which internal route will be employed for through traffic. *Missouri Pacific R.R. Abandonment*, 324 I.C.C. 357, 366 (1965).

16. Petitioners further urge this court "to remand and have the agency's views in light of its ongoing inquiry in *Rulemaking Concerning Traffic Protective Conditions in Railroad Consolidation Proceedings Ex Parte* 282 (Sub. No. 5), 45 F.R. 46461–46464 (July 10, 1980)." Petitioners' Brief at 27–28. Petitioners do not indicate, nor do we understand, how this rulemaking proceeding is relevant to the interpretation of the DT&I conditions in a line abandonment proceeding such as the one before us. Nonetheless, we have reviewed the document produced by that rulemaking, *General Policy Statement for Mergers or Control of at least two Class 1 Railroads*, 46 Fed.Reg. 9113–14 (January 28, 1981), and note that the Commission views its broad authority to impose conditions as "useful in ameliorating the anti-competitive effects of a consolidation." *Id.* at 9114. This view is consistent with our holding in the instant case.

parties have principally framed their arguments in terms of the absence or presence of substantial evidence to support the I.C.C.'s findings, this court has recently questioned whether the substantial evidence standard applies to the review of an I.C.C. abandonment decision. *See Illinois v. United States*, 666 F.2d 1066 at 1072–1073 (7th Cir. 1981). *See also International Minerals & Chemical Corp. v. I.C.C.*, 656 F.2d 251 at 258 n.5 (7th Cir. 1981). These two decisions recognize that the substantial evidence subsection of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(E) (1976), apparently applies when hearings are provided by statute and that the statutes governing railroad abandonments do not require public hearings. *See* 49 U.S.C. § 1a(3) (1976) [49 U.S.C. § 10904(c)(1) (1978)]. The standard of review ultimately employed in *Illinois v. United States* was whether the factual findings of the I.C.C. were arbitrary, capricious or an abuse of discretion, a standard also drawn from the APA. This latter standard appears to apply to agency decisions made without a hearing (frequently informal rulemakings). *See* 5 U.S.C. § 706(2)(A) (1976).

We defer to the use by a panel of this court of the "arbitrary, capricious or abuse of discretion" standard in *Illinois v. United States*, but the distinction between that standard and the substantial evidence test is without practical significance in the case before us. Petitioners challenge the I.C.C. decision on the basis of whether certain findings are unsupported by substantial evidence and are therefore arbitrary.[17] Because any evaluation of the "arbitrariness" of a factual finding necessitates a review of the sufficiency of the evidence, we concur with what we believe to be the thrust of *Illinois v. United States*, intimating that the question is much more semantic than substantial.

■ Finally, as to the degree of precision required under the "arbitrary" stan-

dard, the Supreme Court stated in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), that a reviewing court must:

> consider whether the decision was based on relevant factors and whether there has been a clear error of judgment .... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416, 91 S.Ct. at 823. Because an abandonment application is adjudicative and not legislative in nature, *Illinois* at 1073, the agency must clearly address the specific legal and factual issues raised. *Harborlite Corp. v. I.C.C.*, 613 F.2d 1088, 1092 (D.C.Cir.1979). The I.C.C. must also clearly explain why its decision differed from the decision of the original factfinder, the ALJ. 5 U.S.C. § 557(c) *See NLRB v. P.P.G. Industries, Inc.*, 579 F.2d 1057, 1058 (7th Cir. 1978). Because the ALJ's conclusion was based in part on findings as to the financial burden on the railroad and the impact on shippers, the I.C.C. must explain why it is rejecting the ALJ's conclusions, while accepting his financial findings. *Illinois* at 1075.

### 2. I.C.C. Findings

■ As previously noted, the I.C.C. is required to determine whether the present or future public convenience or necessity supports the abandonment requested. 49 U.S.C. § 1a(4)(a) (1976) [49 U.S.C. § 10903(a) (1978)]. The I.C.C. must balance the present and prospective need for the line against any burden on interstate commerce. *Colorado v. United States*, 271 U.S. 153, 168, 46 S.Ct. 452, 455, 70 L.Ed. 878 (1926). The burden of proof is on the applicant railroad. 49 U.S.C. § 1a(3) (1976) [49 U.S.C. § 10904(b) (1978)].

■ Petitioners ask this court to review the I.C.C. findings that the 25.7 mile line

---

17. Petitioners have not argued, Pet.Reply Brief at 3, that the I.C.C. Decision was arbitrary even in the face of correct factual findings, for example, because there was no rational connection between the findings and the ultimate decision of the I.C.C. *Compare Bowman Transporta-* *tion, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969); *Mindel v. Civil Service Comm'n.*, 312 F.Supp. 485 (N.D.Cal.1970).

has been operating and will continue to operate at a loss. The first challenge to these findings is that traffic on the line has not declined, but has been increasing.

> Traffic has steadily declined in recent years, from 454 cars/year in 1970, to 373 in 1972, and 299 in 1977. There is no evidence of expected future traffic increases.

354 I.C.C. at 794. Petitioners point to other traffic figures in the record that suggest an 11-car discrepancy in the 1970 I.C.C. figures. In addition, it appears that, when reciting traffic calculations, the I.C.C. erroneously attributed the 1976 traffic to 1977. But regardless of any minor statistical errors, the line lost about one-quarter of its traffic between 1970 and 1976. Even if petitioners' statistics correctly show that a slight upswing occurred during 1975–1978, the record indicates that from 1970 to 1978 the line traffic declined 22%. Because the errors do not cast substantial doubt on the I.C.C.'s characterization of the traffic on the line as declining, these I.C.C. mistakes represent harmless error. *See Consolidated Gas Supply Corp. v. Federal Energy Regulatory Commission*, 606 F.2d 323, 328 (D.C. Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 255 (1980); *Braniff Airways, Inc. v. Civil Aeronautics Board*, 379 F.2d 453, 465 (D.C.Cir.1967).

Next, petitioners challenge the I.C.C. finding that future increases in traffic are speculative. Of course, this argument would affect the result only insofar as future increases in traffic would erase the operating deficit. The disputed I.C.C. finding is as follows:

> Tammsco has submitted evidence showing that its volume of traffic has been increasing in recent years and that it expects these increases to continue if adequate rail service is available. This evidence of future increases in traffic volume is speculative, however, and it is not based on specific negotiations with Tammsco customers. Although Tammsco's traffic may have increased in recent years, the total volume of traffic over the

line has been decreasing, as noted in the Division's decision. Further, Tammsco makes no estimate of the revenue that might be derived by MoPac from its anticipated additional traffic. Therefore, we do not believe the record supports a conclusion that there is a reasonable likelihood of future traffic increases eliminating the existing operating deficit being incurred by the line.

I.C.C. Decision at 9. The sort of evidence submitted to rebut this finding is as follows: "[I]t is expected that our growth rate will continue..."[18] and "negotiations are under progress that could put our 1978 rail shipments in excess of 20,000 tons."[19] These comments are inconclusive. Hence, the I.C.C.'s finding that the evidence concerning Tammsco traffic increases was speculative and inadequate to eliminate the line's operating deficit is supported by the record.

Third, petitioners challenge the accounting method used by the I.C.C. to determine the unprofitability of the line. The I.C.C. finding in question states: "the evidence shows that the line incurred an avoidable loss of $14,147 in 1977." I.C.C. Decision at 152.

In its Report and Order of March 24, 1978, the I.C.C. had calculated a different avoidable loss figure for 1977. One of the reasons for requesting a remand from this court was to correct the avoidable loss figures used in the 1978 Report and Order.

When the record was reopened, however, MoPac submitted new avoidable loss calculations based upon a new method of computing off-branch costs for 1977. MoPac's new figures reflect increased mileage for traffic originating in the south and terminating on this line. This increase has been caused by MoPac's decision to route through traffic around this line. Traffic from the south must go north of its final destination and then south on this line, now essentially a spur line.

Petitioners contend that MoPac's new figures overstate off-branch costs by $20,-

---

**18.** Verified statement of John Norton, March 19, 1979.

**19.** Verified statement of John Norton, September 6, 1977.

000. Petitioners' argument is based upon a projection from the off-branch cost/revenue ratio existing prior to 1977. The projected figures ignore the reality that traffic routing patterns changed in 1977.[20] Through traffic no longer moves over this line. Indeed, such movement would be time-consuming because of speed restrictions on the line.

The I.C.C. explained its adoption of MoPac's cost recalculation as a reliance on actual costs. Because the procedure accounts for the material change in traffic routing, the I.C.C. correctly chose to employ an accounting procedure more firmly anchored in reality.[21] The I.C.C. sufficiently explained the reasons for its accounting procedures, and its findings of fact are supported by the record.[22]

■ Finally, petitioners dispute the I.C.C. factual finding that the IC can provide adequate alternative service for Tammsco, the largest shipper on the line. The IC maintains service to Tamms, Illinois, and MoPac has offered to give Tammsco a segment of siding that connects with the IC. The I.C.C. found that the IC service did not differ materially from the existing MoPac service although both were infrequent and suffered from a shortage of boxcars. Petitioners first argue that the IC was not providing service until after the record in this proceeding was closed; second, they contend that the IC may soon abandon the line which provides service to Tammsco.[23]

These arguments are not persuasive. The IC commenced service prior to the Mo-

Pac abandonment and is serving the line at the present time. Although service did not commence until after the record closed, petitioners do not suggest, nor does it occur to us, what could prohibit the I.C.C. from taking official notice of the later commencement of the service. The fact that the IC may subsequently abandon the line should not be considered in the instant case. The IC is alleged only to have indicated on its system map that an abandonment application *may be filed* within three years. If the IC management ultimately decides to file an application, the I.C.C. is statutorily required to consider the interest of shippers such as Tammsco as part of the determination of whether the public convenience and necessity would permit the IC abandonment. Absent a clear showing why different treatment is required, each abandonment proceeding must be decided on its own merits. *Illinois v. I.C.C.*, 615 F.2d 743, 749 (7th Cir. 1980). Further, if we were to consider every prospective (and presently hypothetical) abandonment as relevant to the one before us, we might never bring any case to a close. *See I.C.C. v. City of Jersey City*, 322 U.S. 503, 514–15, 64 S.Ct. 1129, 1134–35, 88 L.Ed. 1420 (1944). The findings and conclusions of the I.C.C. regarding the alternative service by the IC are supported by substantial evidence and are not arbitrary.

### IV. *Documents*

■ Petitioners-appellants ask this court to secure certain documents, or to remand this proceeding to require the I.C.C. to provide "the explanatory documents nec-

**20.** The rerouting has been upheld earlier in this opinion. *See* note 15 *supra*.

**21.** "The earnings capacity of overhead traffic which may be economically handled over other lines of the carrier is of little relevance in abandonment proceedings. See *Seaboard Coast Line R. Co.—Abandonment*, 360 I.C.C. 123, 127 (1974)." I.C.C. Decision at 7.

**22.** Intervening petitioners Cairo Chamber of Commerce, the Southern Illinois Transportation Association and the City of Cairo also argue that the I.C.C.'s accounting standards in abandonment proceedings are inadequate: "Assuming the [1977] loss to be $14,147 instead of a profit, then when this loss is compared to ... [MoPac's total] profit in 1977 ...

the percent of loss is 0.01228 percent." Supplemental Brief for Petitioner-Intervenor at 10. If accepted, this dubious reasoning would prohibit large, profitable railroads from ever abandoning small lines that generate losses. The I.C.C. financial guidelines are adequate in this regard. *See Southern Ry. v. North Carolina*, 376 U.S. 93, 104–05, 84 S.Ct. 564, 570–71, 11 L.Ed.2d 541 (1964).

**23.** We have reviewed petitioners' additional memorandum of August 3, 1981, *and documents* filed to supplement the record on May 26, 1981, on this matter but reject their conclusions for the reasons stated in the text.

essary to its decision." Petitioners' Brief at 28.[24] Petitioners' request for the documents was denied by the I.C.C. Information/Privacy Officer, and, on appeal, by the Chairman of the I.C.C. The request was made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1976), and not pursuant to discovery. Although the request included the notation "Re: Docket No. AB–11," the procedure was unmistakably that of the FOIA.[25] Because petitioners have employed a separate proceeding to obtain these documents, the issue is not for our review. Appeal from an agency denial of a FOIA request should be raised in the district court for *de novo* review. 5 U.S.C. § 552(a)(4)(B) (1976).

### V. Conclusion

We have carefully considered all other issues raised by this appeal and find them to be without merit. Accordingly, we deny the petition challenging the I.C.C.'s order of April 21, 1980 granting abandonment with respect to the 25.7 miles of track.

---

**24.** These documents include a draft decision, written views of General Counsel, a memo rejecting the decision, a revised decision, further written views of General Counsel, and a memo rejecting the revised edition.

**25.** Petitioners' Brief at 27A.