676 F.2d 1144
 215 U.S.P.Q. 100, 1982 Copr.L.Dec. P 25,384,
8 Media L. Rep. 1435
 AMUSEMENT AND MUSIC OPERATORS ASSOCIATION, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
Broadcast Music, Inc., Party-Respondent.
AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent.
AMUSEMENT AND MUSIC OPERATORS ASSOCIATION, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent.
 Nos. 80-2837, 81-1324 and 81-1482.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 2, 1981.
Decided April 16, 1982.
 
 Nicholas E. Allen, Herrick, Allen, Davis & Bailey, Washington, D. C., I. Fred Koenigsbert, New York City, for petitioners.
 John Cordes, U. S. Dept. of Justice, Crim. Div., Charles T. Duncan, Peabody, Rivlin, Lambert Meyers, Washington, D. C., for respondent.
 Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and CAMPBELL, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 On January 5, 1981, the Copyright Royalty Tribunal (the "Tribunal") published its final rule establishing the royalty fee payable by jukebox operators for the public performance of copyrighted nondramatic musical works. 46 Fed.Reg. 884 (1981); see 37 C.F.R. §§ 306.1-306.4 (1981). Various participants in these consolidated cases now seek judicial review of the Tribunal's rule, claiming inter alia that the fee established by the rule is either too high or too low and thus is not supported by the record or is arbitrary and capricious and violates the statutory requirement of reasonableness. After examining the voluminous record and briefs in this case, we find that the Tribunal's final rule is lawful in all respects. Accordingly, we deny the petition for review.
 
 I. FACTS
 A. Statutory Framework
 
 2
 The proceedings which are the subject of this appeal arise under the Copyright Revision Act of 1976 (the "Act"), 17 U.S.C. §§ 101-810 (Supp. I 1977). Under the Act, songs and tunes ("nondramatic musical works") may be copyrighted, but the exclusive rights associated with a copyright under section 106 of the Act are subject to the potential unilateral exploitation device known as the "compulsory license." See 17 U.S.C. §§ 115, 116(b) (Supp. I 1977). Most phonorecords are purchased for private use; they do not require any special licensing for this private use. However, the operators of "coin-operated phonorecord players," or jukeboxes, must secure a compulsory license for the public performance of phonorecords purchased for use in these jukeboxes. By statutory exemption, jukebox operators were for many decades not required to directly compensate the owners of the copyrighted music for the commercial performance of such music. See 17 U.S.C. § 1(e) (1976) (repealed). Congress eliminated this exemption applicable to phonorecords played on jukeboxes when it passed the new Act and developed a method to provide compensation from the operators of jukeboxes to the owners of the copyrighted music utilized by the operators.
 
 
 3
 Section 116 of the Act requires jukebox operators seeking compulsory licenses to file an application with the Register of Copyrights enumerating the number and location of their jukeboxes "and (to) deposit ... a royalty fee for the current calendar year of $8.00 for (each) phonorecord player." 17 U.S.C. § 116(b)(1) (Supp. I 1977). These fees are then distributed to copyright owners (after the deduction of administrative expenses) pursuant to section 116(c). The $8.00 fee was the first jukebox royalty provision in this country. The fee level, coming after an absence of any fee requirement for almost seventy years, "represents a compromise figure adopted in 1967 and, as a compromise, it is acceptable as the rate to be specified in section 116.... (The House Judiciary) Committee has accepted the $8 jukebox royalty in the expectation that it would be subject to periodic review." H.R.Rep.No. 1476, 94th Cong., 2d Sess. 113, 115 (1976), U.S.Code Cong. & Admin. News 1976, pp. 5659, 5728-5731.
 
 
 4
 The Act also provided for the establishment of the Tribunal as the administrative agency "to make determinations concerning the adjustment of reasonable copyright royalty rates as provided in section ( ) ... 116." 17 U.S.C. § 801(b)(1) (Supp. I 1977). As a procedure for the determination of reasonable royalty rates, section 801(b)(1) of the Act directed the Tribunal to establish a rate that best achieves several specified objectives.[1] Pursuant to a timetable set out in the Act, see 17 U.S.C. § 804 (Supp. I 1977), the Tribunal was directed to commence proceedings in January, 1980, to determine whether an adjustment of the jukebox royalty fee established in 1976 by Congress in connection with the compulsory licensing ($8 per year per box) was warranted under the criteria of section 801(b)(1). The Tribunal's final decision was due by the end of 1980. 17 U.S.C. § 804(e) (Supp. I 1977). After that date, the final decision might be changed only in new rulemaking proceedings initiated by petition of a person with a "significant interest." This option to undertake a new rulemaking is available "in 1990 and in each subsequent tenth calendar year thereafter." 17 U.S.C. §§ 804(a)(2) and (a)(2) (c) (Supp. I 1977).
 
 B. Tribunal Proceedings
 
 5
 Four organizations responded to the Tribunal's Federal Register notice commencing the jukebox royalty proceedings. See 45 Fed.Reg. 62 (1980). Copyright owners were represented by the three principal performing rights societies: American Society of Composers, Authors and Publishers (ASCAP); Broadcast Music, Inc. (BMI); and SESAC, Inc. The jukebox industry was represented by the Amusement and Music Operators Association (AMOA). The Tribunal conducted seven days of hearings and reviewed numerous economic studies and other exhibits. After these proceedings, the Tribunal considered proposed findings and conclusions submitted by ASCAP, BMI and AMOA. On December 10, 1980, the Tribunal adopted its decision at a public session and on January 5, 1981, the Tribunal's final rule was published together with its statement detailing "the criteria that the Tribunal determined to be applicable to the particular proceeding, the various facts it found relevant to its determination in that proceeding, and the specific reasons for its determination." 17 U.S.C. § 803(b) (Supp. I 1977); see 46 Fed. Reg. 884-91 (1981).
 
 
 6
 The Tribunal ruled upon a number of legal contentions that were raised during the proceedings, the most significant of which concerned the "burden of proof," the structure of rates allowed by the Act and the necessity for calculating rates of return. AMOA contended that the burden of proof to justify any increase above the $8.00 fee set by Congress rested on the copyright owners. The Tribunal rejected this contention, reasoning that since the statute required an initial determination of the reasonableness of the $8.00 fee during 1980 (without the need of an initial petition) and then permitted new determinations once every decade only upon the petition of interested parties, Congress could not have intended to make the copyright owners "petitioners" shouldering the burden of proof in the initial proceedings. In effect, the Tribunal found that none of the parties had the burden of proof in the initial mandatory proceeding.
 
 
 7
 AMOA also argued that the Tribunal lacked the statutory authority to create a rate structure that would allow the Tribunal to automatically adjust the fee during the term of a proposed rate[2] to reflect deterioration of the fee's real value due to inflation. In support of this argument, AMOA noted that the statutory provisions related to the jukebox compulsory license (sections 116 and 804) employed only the term "rates" when outlining the Tribunal's authority rather than the phrase "terms and rates," which is found in the provision applicable to public broadcasting. See 17 U.S.C. § 118(b) (Supp. I 1977). The Tribunal rejected AMOA's argument. Holding that the word "terms" was employed in the public broadcast provision to insure that the Tribunal could control such ancillary matters as payment methods, the Tribunal concluded that nothing in the Act or its legislative history could be construed to proscribe the application of annual cost of living adjustments to the jukebox royalty fee.
 
 
 8
 Finally, the Tribunal also rejected AMOA's argument that, when establishing a royalty fee, the Act required the Tribunal to calculate individual compensation or returns to individual copyright owners from their ownership of copyrighted music rather than permitting reliance on a collective rate of return applicable to the copyright owners as a group. The Tribunal found that the legislative history of the Act evinced no intent that the Tribunal regulate the internal operations of the performing rights societies. The Tribunal's authority was strictly limited to setting applicable royalty fees and establishing the distribution to claimants. The Act in section 116(c)(4)(B) specifically provides that royalty fees are to be distributed to the performing arts organizations.
 
 
 9
 The Tribunal determined in its order of January 5, 1981, that the royalties payable by jukebox operators to the owners of copyrighted music should be set at a level of $50.00 per jukebox per year. Purportedly recognizing its obligation to balance fairness to copyright owners with its duty to avoid disruption of the jukebox industry, see note 1 supra, the Tribunal provided for the implementation of the $50.00 per year fee in two stages. The Tribunal ordered jukebox operators to pay only $25.00 per jukebox in 1982 and 1983; thereafter, the operators would be liable for the full $50.00 fee. Finally, the Tribunal also determined to subject the royalty fee to a cost-of-living adjustment in 1987.
 
 
 10
 The Tribunal apparently reached its conclusions as to the level of royalty fees by relying primarily on marketplace analogies. According to the Tribunal, certain "marketplace parallels" could serve as appropriate benchmarks to be weighed together with the entire record and the statutory criteria in arriving at a fair royalty fee. This marketplace approach is, of course, essentially a method of attempting to establish a parity between regulated royalty fees to be paid by jukebox operators for the use of copyrighted works and fees charged for comparable rights in a regime of competition (sometimes affected by direct government regulation).
 
 
 11
 In adopting the marketplace analogy approach, the Tribunal rejected AMOA's contention that it should establish the value of individual musical works based on the time and expense incurred by songwriters in producing each work, together with a value derived from the placement of a work on a popularity chart. AMOA's approach, which apparently seeks to base the fee in part upon the cost to the copyright owner, would arguably meet one of the four objectives set forth in section 801, i.e., the provision of a fair return to the copyright owner for the use of his work. The Tribunal's decision to reject this kind of individualized cost-based approach is analogous in some respects to certain decisions of the Federal Power Commission (FPC) applying the Natural Gas Act of 1938 to the wellhead price of natural gas. Just as the FPC abandoned as impracticable its effort to set a reasonable natural gas price for each independent natural gas producer based on costs peculiarly assignable to that producer, the Tribunal here declined to set an appropriate rate based on cost-related factors involved in the production of each copyrighted work. Instead the Tribunal relied on more general marketplace analogies not related to cost. See Permian Basin Area Rate Cases, 390 U.S. 747, 754-70, 88 S.Ct. 1344, 1353-61, 20 L.Ed.2d 312 (1968).[3] Thus, the Tribunal attempted to set a uniform rate applicable to all jukeboxes and payable on an annual basis. The fee was payable without regard to the amount of copyrighted material used or the revenues generated for the jukebox operator by the use of the copyrighted material.
 
 
 12
 The Tribunal provided a detailed analysis of its final rule in relation to the four statutory criteria set out in section 801. The Tribunal did not find the first statutory objective of maximizing "the availability of creative works to the public" to be a crucial factor in this case because the "reasonable payment for jukebox performances will add incrementally to the encouragement of creation by songwriters and exploitation by music publishers." 46 Fed. Reg. 889 (1981). The second criterion-affording a fair return to the owner and a fair income to the user-was satisfied in major part, according to the Tribunal, by the use of marketplace analogies, modified by the phasing-in of the fee schedule and by adjusting the fee for future inflation. With respect to the third criterion, the Tribunal indicated inter alia that there was "no basis for concluding that jukebox operators and owners of establishments with jukeboxes make any unique or distinctive contribution concerning creativity, technology, capital investment, cost, risk and the opening of new markets for creative expression and media for their communication." 46 Fed. Reg. 889 (1981). Hence, the Tribunal found that the equities weighed in favor of higher remuneration to copyright owners. The fourth criterion emphasized the minimization of any disruptive impact on the structure of the industries involved and on generally prevailing industry practices. As to this criterion, the Tribunal found that a failure to establish a reasonable fee for jukebox performances could interfere with the receipt by performing rights societies of reasonable fees from other users of copyrighted music by artificially depressing fees similar to those under examination. The Tribunal, however, recognized that its decision would also affect the jukebox industry because of the low profit margin earned by most jukebox operators. The Tribunal concluded that the phasing-in approach to fee increases which it adopted "adequately reflected" concern for the impact of the change on all parties involved.
 
 II. STANDARD OF REVIEW
 
 13
 Our jurisdiction to review the Tribunal's decision is based on 17 U.S.C. § 810 (Supp. I 1977), which provides:
 
 
 14
 Any final decision of the Tribunal in a proceeding under section 801(b) may be appealed to the United States Court of Appeals, within thirty days after its publication in the Federal Register by an aggrieved party. The judicial review of the decision shall be had, in accordance with chapter 7 of title 5 (of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (1976) ), on the basis of the record before the Tribunal. No court shall have jurisdiction to review a final decision of the Tribunal except as provided in this section.
 
 
 15
 On this appeal, the Tribunal argues that the appropriate provision of the Administrative Procedure Act (APA) to apply with respect to judicial review here is 5 U.S.C. § 706(2)(A) (1976), which provides that a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be-(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This, of course, is the standard of review generally provided by the APA for informal rulemaking. See National Association of Food Chains, Inc. v. ICC, 535 F.2d 1308, 1313-14 (D.C.Cir.1976) (per curiam).
 
 
 16
 On the other hand, AMOA argues, on the basis of a number of factors including legislative history, that the intent of Congress was to subject the Tribunal's decisions to the "full scope" of judicial review provided by the APA.[4] We understand AMOA's argument to suggest the applicability not only of 5 U.S.C. § 706(2)(A)-the "arbitrary and capricious" standard-but also the standard from 5 U.S.C. § 706(2)(E) which requires that the determinations of the Tribunal be supported by "substantial evidence." AMOA also apparently argues that review under either of these two standards in the instant case would produce the same result.
 
 
 17
 At least technically, the Tribunal correctly argues that the APA requires review under the "substantial evidence" standard only in cases "subject to sections 556 and 557 of the (APA) or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E) (1976). Sections 556 and 557 set forth the requirements for, respectively, formal rulemaking and formal adjudications, under the APA. The Tribunal argues that these sections are not applicable here, however, because this proceeding is neither an APA-required formal rulemaking nor an APA-required adjudication. Further, the Tribunal's enabling legislation does not expressly require an "on the record ... agency hearing." See 5 U.S.C. § 553(c) (1976). The Act refers only to Tribunal "proceedings," see 17 U.S.C. § 804 (Supp. I 1977), in contrast to "on the record ... hearings," as specified in the APA's provision governing the applicability of the substantial evidence test. Thus, according to the Tribunal, it remains free to establish whatever procedures it deems necessary for its "proceedings."
 
 
 18
 The Tribunal by regulation has elected to adopt quite formal procedures in its royalty adjustment proceedings. See 37 C.F.R. §§ 301.40-301.56, 301.60-301.69 (1981).[5] But self-imposed formal proceedings not required by statute presumably do not call into play the substantial evidence standard of review. See Automobile Club of New York, Inc. v. Cox, 592 F.2d 658, 664 (2d Cir. 1979). In addition, the Tribunal in conducting royalty adjustment proceedings is presumably engaged in the approval of rates for the future and these activities therefore constitute rulemaking as defined by the APA. See 5 U.S.C. §§ 551(4), (5) (1976).
 
 
 19
 We believe that the standard of judicial review enunciated by the late Judge Leventhal in American Public Gas Association v. FPC, 567 F.2d 1016, 1028-29 (D.C.Cir.1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978), is appropriate to the instant proceeding. That standard requires us, inter alia, to analyze the record to determine that "there (is) support in the public record for what is done" and that the Tribunal " 'has given reasoned consideration to each of the pertinent factors (involved in the decision).' " American Public Gas, 567 F.2d at 1029 (quoting Permian Basin Area Rate Cases, 390 U.S. 747, 791, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968)).[6]
 
 
 20
 American Public Gas involved essentially the second venture of the FPC in setting national wellhead rates for new natural gas applicable to producers operating under widely disparate conditions. Essentially, the agency in that case used a notice-and-comment rulemaking procedure. Although this procedure was certainly less rigorous than the one pursued by the Tribunal in the instant case, we think that the standard of judicial review employed by Judge Leventhal in American Public Gas is quite in point to the instant problem. The Tribunal in this case faced a task similar in some respects to the problem confronting the FPC in American Public Gas: it had to establish a national royalty fee applicable to widely disparate jukebox owners and operators where the fees will redound (through the performing rights societies) ultimately to the benefit of widely disparate copyright owners. In American Public Gas, Judge Leventhal noted, as the Tribunal argues here, that some commentators have interpreted the "substantial evidence" rule to require a more rigorous standard of review than the "arbitrary-capricious" standard. We agree with Judge Leventhal (who in turn agreed with Judge Friendly)[7] that the issue is largely semantic and that the two criteria "tend to converge" in notice-and-comment rulemaking. American Public Gas, 567 F.2d at 1029; accord K. Davis, Administrative Law of the Seventies § 29.00 (1976). But cf. Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106, 140-41 (1973) (per curiam) (court applied arbitrary and capricious standard rather than substantial evidence standard to review administrative adjudication).
 
 
 21
 Although we are not confronted here with notice-and-comment rulemaking, we believe that the two criteria do indeed tend to converge when applied to the Tribunal's fee determination. We also agree with Judge Leventhal that "(w)hat is basic is the requirement that there be support in the public record for what is done." American Public Gas, 567 F.2d at 1029; accord Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); City of Chicago v. FPC, 458 F.2d 731 (D.C.Cir.1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). Moreover, in a closely analogous setting, the District of Columbia Circuit recently reviewed the royalty fee established by the Tribunal for the compulsory licensing of phonorecords pursuant to section 115 of the Act and concluded that the arbitrary and capricious standard was applicable. Recording Industry Association of America v. Copyright Royalty Tribunal, 662 F.2d 1, 7-8 (D.C.Cir.1981).
 
 
 22
 Thus, we agree with the Tribunal that, upon a close reading of the APA, the most appropriate standard of review applicable to this record is the "arbitrary and capricious" standard. But we do not believe that application of this standard to the instant case will produce a significantly different result than attempting to determine whether there is substantial evidence in the record to support the Tribunal's findings. Thus, under either test we believe that the Tribunal's conclusions pass muster. Our essential conclusions in this case also rely in large measure on the legislative history of the Act, which bespeaks an intent to subject Tribunal determinations to the "full scope" of judicial review. See note 4 supra.
 
 
 23
 The standard-of-review analysis here is not unlike our analysis in Illinois v. United States, 668 F.2d 923 (7th Cir. 1981) ("Mopac "). In that case, we followed the earlier determination of a panel of this court in Illinois v. United States, 666 F.2d 1066 (7th Cir. 1981), in applying the "arbitrary and capricious" standard to rail line abandonment proceedings conducted by the Interstate Commerce Commission. The abandonment proceedings in Mopac were carried on pursuant to statutes that did not, as in the instant case, require public hearings. In addition, the complexity of both the issues and the factual evidence in Mopac necessitated a careful and searching analysis of the record by the reviewing court, notwithstanding any difference in theory in level of scrutiny demanded by the substantial evidence or by the arbitrary and capricious formulae, respectively. Under those circumstances, we noted in Mopac that the "distinction between (the arbitrary and capricious) standard and the substantial evidence test is without practical significance." 668 F.2d at 930. We believe that the instant case is quite comparable to Mopac not only because of the apparent absence of requirements for on-the-record hearings but also because the complexity of both cases requires a careful, "full-scope" review of the record, regardless of the particular reviewing standard employed. Thus, the "arbitrary and capricious" test in this particular situation prescribes a process of review not unlike that which would be pursued under the "substantial evidence" standard.
 
 
 24
 III. APPEAL OF THE AMUSEMENT AND MUSIC OPERATORS ASSOCIATION
 
 
 25
 The AMOA presented numerous witnesses and exhibits, including a survey conducted by the public accounting firm of Peat, Marwick, Mitchell and Company ("PMM & Co."), to demonstrate the depressed economic condition of the jukebox operators' business. These witnesses provided such information as the number of jukebox operators, the number of jukeboxes in operation, the number of jukeboxes produced per year, the size of the typical jukebox operator's business and the prices charged per play. In general, the PMM & Co. survey revealed that the typical jukebox operator operated 77 jukeboxes and 225 amusement games. Jukeboxes and games are operated together in 65% of all jukebox locations, and approximately 65% of all jukeboxes are located in cities of 40,000 or less population. According to the AMOA's operator witnesses, jukeboxes usually provide two plays for a quarter or five plays for fifty cents, thus averaging about ten cents per play. The survey by PMM & Co. indicated that for the jukebox industry at large, 18% of the jukeboxes in operation earned for their operators less than $300.00 per year and that 47% of the jukeboxes earned less than $700.00 per year. PMM & Co.'s survey also purported to show that for smaller operators (i.e., those operating fewer than 50 jukeboxes), 23% of their jukeboxes earned less than $300.00 per year and 56% earned less than $600.00 per year.
 
 
 26
 Other evidence demonstrated that during the forty year period from 1940 to 1980, the average price per play on jukeboxes had not increased at a rate commensurate with the inflation as measured by the Consumer Price Index (CPI). Additional evidence was introduced to show the general downward trend in the jukebox manufacturing business in the United States as demonstrated by a decline in units shipped during the 1970's. Finally, several jukebox operators testified that the continuing decline in the number of jukeboxes in operation was attributable both to the operators' inability to increase prices per play in line with inflation and to the loss of prime jukebox locations due to socio-economic changes, such as urban redevelopment and the replacement of jukeboxes by other means of entertainment.
 
 
 27
 Citing this evidence of the decline in the jukebox operating business as demonstrated by decreasing revenues and margins of profit and the industry-wide reduction in numbers of locations and of jukeboxes in operation, AMOA argued before the Tribunal that the $8.00 royalty fee set by Congress when it passed the Act should be left unchanged. In addition, AMOA argued that the performing rights organizations bore the burden of establishing the necessity for an increase in the $8.00 licensing fee and that there was no statutory basis for the inflation adjustment ordered by the Tribunal to take effect on January 1, 1987. As previously indicated, the Tribunal found that the plain structure of the statute could not be reconciled with an approach which in effect would make the copyright owners "petitioners" in the initial mandatory proceeding and that an inflation adjustment during the effective term of a rate was not precluded by the Act.
 
 
 28
 Essentially, AMOA now argues on appeal that the $8.00 fee was selected by Congress for reasons other than reaching a temporary compromise, that any party seeking to change the $8.00 fee in the initial mandatory determination must bear the burden of proof supporting a change, and that the Tribunal erred by increasing the royalty fee when the evidence demonstrated that an increased fee may cause some jukeboxes to become unprofitable. We believe that the legislative history of the Act clearly refutes these contentions. The reports of both the Senate and the House Judiciary Committees,[8] which took basically similar approaches and used similar language, demonstrate that the basis of AMOA's argument is incorrect. After discussing the principal contentions for and against eliminating the fee exemption of the jukebox industry under the previous copyright statutes, the House Judiciary Committee concluded:
 
 
 29
 1. The present blanket jukebox exemption should not be continued. Whatever justification existed for it in 1909 exists no longer, and one class of commercial users of music should not be completely absolved from liability when none of the others enjoys any exemption.
 
 
 30
 2. Performances on coin-operated phonorecord players should be subject to a compulsory license (that is, automatic clearance) with statutory fees. Unlike other commercial music users, who have been subject to full copyright liability from the beginning and have made the necessary economic and business adjustments over a period of time, the whole structure of the jukebox industry has been based on the existence of the copyright exemption.
 
 
 31
 3. The most appropriate basis for the compulsory license is a statutory per box fee, with a mechanism for periodic review and adjustment of the per box fee. Such a mechanism is afforded by the Copyright Royalty Commission.
 
 
 32
 4. The $8 per box annual compulsory license fee represents a compromise figure adopted in 1967 and, as a compromise, it is acceptable as the rate to be specified in section 116. The Committee was impressed by the testimony offered to show that shifting patterns in social activity and public taste, combined with increased manufacturing and servicing costs, have made many jukebox operations unprofitable.
 
 
 33
 H.R.Rep. No. 1476, 94th Cong., 2d Sess. 113 (1976), U.S. Code Cong. & Admin. News 1976, pp. 5728, 5729 (emphasis supplied).
 
 
 34
 The Senate Judiciary Committee Report reiterated verbatim the first three paragraphs of the House Report and slightly modified the final paragraph as follows:
 
 
 35
 4. This committee in 1958 recommended an average annual per box payment of $19.70. The most recent hearings on the jukebox question did not provide any indication that the committee's decision in 1958 was unwise or the rate of payment unreasonable. In providing in this legislation for a total payment of $8 per box the committee has been greatly influenced by the desire to conform to the rate provided in the copyright legislation passed by the House of Representatives during the 90th Congress. Therefore, although a higher rate would be warranted, the committee has endeavored to facilitate the progress of this legislation by preserving, to the extent possible in view of other provisions of this bill, the rate adopted by the House of Representatives.
 
 
 36
 S.Rep. No. 473, 94th Cong., 1st Sess. 96-97 (1975) (emphasis supplied). Although the House Judiciary Committee seemed more concerned with the economic plight of the jukebox industry, both reports strongly suggest that the $8.00 fee was a political compromise. Certainly there is nothing in the reports to suggest that the $8.00 fee represents a finding by Congress of a reasonable fee for the 1980's.
 
 
 37
 The procedures established by the Act for determining and implementing the royalty fee underscore this conclusion. Section 804(a) of the Act directs the Tribunal to institute proceedings to adjust the jukebox fees set in section 116 in order to determine a reasonable fee under the criteria of section 801(b) (1). Subsequent to the initial establishment of a reasonable fee, the Tribunal is directed by section 804(a)(2)(C) to conduct proceedings for further adjustments in 1990 only upon the petition of a copyright owner or user with a significant interest. Since the relevant congressional committees have expressly disavowed any notion that the $8.00 fee was either reasonable or "calculated to achieve" the goals of section 801(b) and because Congress directed the Tribunal to conduct initial proceedings determining the reasonableness of the $8.00 fee in 1980, we think the Tribunal correctly concluded that no special legislative imprimatur is attached to the $8.00 fee.
 
 
 38
 We also reject AMOA's argument that section 803(a) of the Act, in conjunction with section 556(d) of the APA, 5 U.S.C. § 556(d) (1976), places a burden of proof on copyright owners to justify an increase in the $8.00 royalty fee. Section 803(a) of the Act declares that "chapter 5, subchapter II and chapter 7" of the APA apply to Tribunal proceedings. It is far from clear whether this provision incorporated by reference APA section 556(d), which provides that "(e)xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." Section 556 presumably does not apply if, as here, there appears to be no requirement in the Act for formal hearings. See 5 U.S.C. §§ 553(c), 556(a) (1976). But in any event, the requirement of section 556(d) that "the proponent(s) of a rule or order (have) the burden of proof" is coupled with the phrase "(e)xcept as otherwise provided by statute." 5 U.S.C. § 556(d) (1976) (emphasis supplied). In the instant case, we believe that the statute provides "otherwise." The statutory scheme which directs the Tribunal to hold initial ratemaking proceedings makes it quite clear that the copyright owners in this case are no more the "proponent(s) of the rule" than is AMOA. ASCAP, for example, is under no greater or lesser burden to prove the propriety of its $70.00 royalty fee proposal than is AMOA to prove the validity of its proposed $8.00 fee.
 
 
 39
 Moreover, AMOA has failed to demonstrate in this case that the Tribunal acted arbitrarily and capriciously or without support in substantial evidence when it rejected the proposed $8.00 fee. The centerpiece of the AMOA's evidence was the survey conducted by PMM & Co. The survey purported to show that 18% of all jukeboxes in operation earned for their operators less than $300.00 per year and that 57% earned less than $600.00 per year. The survey also suggested that the operators' average annual revenue per jukebox was $754.00 while their average annual operating cost per jukebox was $673.00, thus producing a statistically calculated average gross profit per jukebox of $88.00 annually. These survey statistics indicate that many jukeboxes, especially those of operators with fewer than 50 boxes, are operated at a loss or at no significant profit, and that any increase in the jukebox royalty rate would probably force some small operators out of business.
 
 
 40
 We agree with the Tribunal, however, that the conclusions of this survey should be accorded little weight. The questionnaire distributed in connection with the survey generated a low response rate from the jukebox operators, estimated by PMM & Co. at approximately 14%. Dr. John Scarbrough, the PMM & Co. manager in charge of the survey testified, "I wouldn't argue very hard if you wanted to say that it was not a good response." 46 Fed. Reg. 888 (1981). If substantial weight is not accorded to the survey, AMOA is left with relatively anecdotal evidence concerning the marginal profitability of some jukeboxes and some jukebox operations.
 
 
 41
 Marginal constituents populate every industry in a market economy, and some of these constituents may go out of business when costs increase. But to accept the proposition that AMOA may deprive copyright owners of increased remuneration for the exploitation of their works by showing that some jukebox operations will become unprofitable is, we believe, unsound and unjust. The Tribunal found that "this testimony (anecdotal testimony of selected jukebox operators and other industry witnesses) does not provide a basis for forming any representative picture of the jukebox industry nor does it create a foundation for the industry's claim of economic hardship." 46 Fed. Reg. 888 (1981). We believe that the action of the Tribunal in making this finding is not "arbitrary and capricious."
 
 
 42
 Finally, AMOA challenges the validity of the Tribunal's decision to phase in the royalty rate increase and to allow an inflation adjustment in 1987. We believe that both the phase-in mechanism and the inflation adjustment, which cut in opposite directions, merely demonstrate a flexibility with which Congress intended to endow the Tribunal in making its determinations. Although section 801(b)(1) directs the Tribunal to make a determination of a reasonable fee, the language Congress actually selected to describe this duty specifically directs the Tribunal "to make determinations concerning the adjustment of reasonable copyright royalty rates." 17 U.S.C. § 801(b)(1) (Supp. I 1977). There is nothing in this language to preclude a reasonable royalty from including a device to ease the disruption attendant upon a new fee substantially departing from the current level; in fact, section 801(b)(1)(D) imposes the contrary requirement. See note 1 supra. Similarly, a cost of living or other inflation adjustment designed to maintain the real value of the fee set by the Tribunal is not prohibited but is instead affirmatively supported by the language of the Act.[9]
 
 
 43
 In fact, the phase-in mechanism which AMOA attacks is supported by that part of the record generated by AMOA to reflect the fears of its witnesses with respect to the impact of the new fee. We do not believe that the objection by AMOA to the CPI as an appropriate measure of changing values of the royalty fee as measured in nominal dollars should be accorded much weight. Other adjustment mechanisms, such as the Gross National Product Price Deflator, see 15 U.S.C. § 3311(a) (Supp. III 1979), are perhaps available, but the CPI (even though it measures a typical cost of living change) is broadly used as an appropriate reflection of inflation, and we think its use in the present context is not arbitrary or capricious and is adequately supported by substantial evidence.
 
 IV. THE ASCAP/SESAC CASE
 
 44
 ASCAP and SESAC jointly presented arguments and evidence to the Tribunal relying on so-called marketplace analogies as the basis for their claim that the royalty fee should be increased above the $8.00 rate. Dr. Paul Fagan, an ASCAP witness, testified about three marketplace analogies-competitive models, so to speak-upon which the amount of a royalty fee could be based. The first such analogy was to the license fees paid to copyright owners by commercial establishments such as restaurants, taverns, bars and grills which use tape recorders, record players or jukeboxes not subject to compulsory license to play copyrighted music.[10] Dr. Fagan testified that the lowest such fee received by ASCAP alone for the right to play the copyrighted music of its members in these establishments was $70.00; the total minimum aggregate fee paid by such establishments to ASCAP, BMI and SESAC for the right to play a member's music was $190.00. If the compulsory license did not exist, ASCAP would charge at least $70.00 for the right to operate jukeboxes playing copyrighted music in these establishments. According to ASCAP, if all three repertories were licensed at once, under these circumstances, the resulting minimum license fee would be at least $140.00.
 
 
 45
 Dr. Fagan also testified as to license fees paid to the performing rights groups by the providers of background music services. The ASCAP fee alone for background music in establishments comparable to those where jukeboxes were used would be about $27.00 for each establishment. Adjusting this figure for inflation occurring since 1971, Dr. Fagan arrived at a fee of about $52.08 for 1980. The third analogy testified to by Dr. Fagan involved license fees paid by foreign jukebox operators to foreign performing rights groups where the fees were either negotiated with industry groups or were subject to governmental approval. Dr. Fagan found that the average fee paid by jukebox operators in the nineteen countries surveyed by ASCAP was $95.33, and the mean was $70.92. He noted, moreover, that fees charged in the United States should be higher than those charged abroad because of the generally higher level of income in this country.
 
 
 46
 ASCAP and SESAC concluded that these marketplace analogies suggested a "zone of reasonableness"[11] for the royalty fee between $70.00 and $140.00. They recommended to the Tribunal that it set the fee at the low end of that zone (i.e., $70.00), with an annual inflation adjustment. Dr. Fagan testified that the jukebox operators could afford a $70.00 fee since this would amount to a daily charge of only 19 cents per jukebox.
 
 
 47
 In general, the Tribunal found that the concept and methodology of the ASCAP/SESAC rate determination was "most attractive." The Tribunal conceded, however, that the marketplace analogies, individually and collectively, were subject to limitations and distinguishing features. AMOA contended, for example, that "mechanical" and "background" music lack the basic element of customer selection which is a distinguishing feature of jukebox-furnished music. AMOA also argued that jukebox license fees reportedly paid in foreign countries lack comparability because of the many differences among the foreign countries surveyed. Conversion of foreign fees into United States equivalents, as proposed by an ASCAP witness, is too simplistic a procedure to provide credible comparisons for domestic purposes. Perhaps more fundamentally, AMOA asserted that the "marketplace" analogies were generally inappropriate because the allegedly analogous fees in each situation were established under the protection of government-granted monopoly rights (which exist presumably in the form of copyright protection) rather than in a free competitive market. AMOA also objected to these comparisons because the type of performances in question lack comparability to performances of music on jukeboxes.
 
 
 48
 We think that the Tribunal could properly take cognizance of the marketplace analogies while appraising them to reflect the differences in both the respective markets (e.g., with respect to volume and industry structure) and the regulatory environment. It is quite appropriate and normal in this administrative rate determination process to find distinguishing features among various analogous situations affecting the weight and appropriate thrust of evidence rather than its admissibility. No authority cited by AMOA would require the Tribunal to reject the ASCAP/SESAC analogies. Comparable rate analogies have been repeatedly endorsed as appropriate ratemaking devices. See, e.g., San Antonio v. United States, 631 F.2d 831, 836-37 (D.C.Cir.1980), clarified, 655 F.2d 1341 (D.C.Cir.1981); Burlington Northern, Inc. v. United States, 555 F.2d 637, 641-43 (8th Cir. 1977). Moreover, we believe that ASCAP/SESAC presented the most credible and relevant evidence before the Tribunal. The arguably analogous musical fees provide substantial evidence of the value of the right to play copyrighted music on a jukebox, and the agency did not act arbitrarily or capriciously under the circumstances in considering these fees as a benchmark.
 
 
 49
 In its decision, the Tribunal acknowledged that the rate which it approved could not be directly linked to marketplace parallels, but it found that such parallels served as appropriate points of reference to be weighed together with the entire record and the statutory criteria. Although we agree with ASCAP that the analogous marketplace evidence is significant, we do not believe that the Tribunal was bound by that evidence to select a fee rate within the $70.00-$140.00 "zone" which, according to ASCAP, governs this case. The Tribunal carefully weighed the evidence derived from the marketplace analogies and other evidence specifically in light of the four statutory criteria of section 801(b) and arrived at a royalty rate for coin-operated phonorecord players of $50.00 per machine. In recognition particularly of the fourth statutory criterion, which counseled minimization of the disruptive impact on the industries involved, the Tribunal ordered the $50.00 rate to go into effect on a phased-in basis. Indeed, the Tribunal could not ignore this statutory directive to consider industry disruption-a factor which the marketplace evidence, standing alone, does not address. Moreover, AMOA accurately points out that certain characteristics of jukebox music such as direct customer selection and a direct customer charge for the music, are not found in the forms of music relied on for the marketplace analogies. Thus, we believe that the Tribunal's reliance on the ASCAP/SESAC evidence together with the statutory criteria and the entire record in arriving at the $50.00 fee is not arbitrary and capricious and is fully supported by substantial evidence on the record as a whole.
 
 V. THE BMI CASE
 
 50
 The evidence and arguments presented to the Tribunal by BMI were relatively simple. BMI proposed that the Tribunal determine the fee by applying the Consumer Price Index to a proposed jukebox royalty rate of $19.70, first referred to in a 1958 Senate committee report recommending repeal of the jukebox royalty exemption. See S. Rep. No. 2414, 85th Cong., 2d Sess. 12 (1958). In this report the Senate committee apparently reached the conclusion that a proposed differential rate arrangement would produce an average per annum royalty of $19.70 per jukebox. In 1966, a House committee conducted an economic study in connection with another bill attempting to impose a performance fee on jukebox operators, concluding that a fair average rate would be $19.20-a rate which the BMI argues is very comparable to $19.70. See H.R. Rep. No. 2237, 89th Cong., 2d Sess. 112 (1966). The $19.20 figure was again noted favorably by the House Judiciary Committee in 1967. See H.R. Rep. No. 83, 90th Cong., 1st Sess. (1967).[12] BMI argues that the legislatively approved rate should be adjusted for changes through 1980 in the price level from the date when, BMI contends, Congress gave its most recent recognition to the reasonableness of the $19.70 figure (i.e., 1975). See S. Rep. No. 473, 94th Cong., 1st Sess. 96-97 (1975); Hearings Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 94th Cong., 1st Sess. 426 (1975) (statement by Rep. Kastenmeier). This adjustment results in a recommended fee of $30.00 which, if adopted, would then be adjusted annually for inflation.
 
 
 51
 We believe that this approach based upon previous legislative references to various royalty rates contained in bills which Congress did not enact does not accord with the mandate of the Act that the Tribunal perform an independent analysis based upon evidence to arrive at a fair and reasonable fee. Congress would not have provided ratemaking procedure and criteria of fairness if it merely expected the Tribunal to derive a royalty rate from legislative history. Hence, we believe that the Tribunal correctly found "that (BMI's) approach is not in accord with our statutory responsibilities in this proceeding." 46 Fed.Reg. 888 (1981).
 
 
 52
 VI. PERFORMING RIGHTS SOCIETIES' FINANCIAL DATA
 
 
 53
 In the proceedings before the Tribunal, the AMOA vigorously sought to bring into issue the manner in which the performing rights organizations distributed jukebox royalties to their affiliates and members. AMOA argued that the Tribunal was required by section 801(b)(1)(B) of the Act to investigate the distribution methods of the performing rights organizations. We find that these arguments are conclusively answered in section 116(c)(4)(B) of the Act which specifically provides that royalty fees are to be distributed to the performing rights organizations:
 
 
 54
 (4) The fees to be distributed shall be divided as follows:
 
 
 55
 (B) to the performing rights societies, the remainder of the fees (not distributed directly pro rata to copyright owners) in such pro rata shares as they shall by agreement stipulate among themselves, or, if they fail to agree, the pro rata share to which such performing rights societies prove entitlement.
 
 
 56
 17 U.S.C. § 116(c)(4)(B) (Supp. I 1977). This language of the Act evinces Congress' recognition of the collective nature of the ratemaking process in these circumstances. As already indicated, we believe it would be not only improper but also impossible to attempt to provide each copyright owner with an appropriate return on his or her "investment" in copyrighted material. See Permian Basin Area Rate Cases, 390 U.S. at 805-13, 88 S.Ct. at 1379-84. Therefore, we believe that the inquiries sought by AMOA into the internal distribution processes of the performing rights societies are irrelevant to the purposes of the Act and that the Tribunal acted properly in denying these requests.
 
 
 57
 VII. TRIBUNAL'S ACCEPTANCE OF BMI LETTER WITHOUT SERVICE ON
 
 OTHER PARTIES
 
 58
 AMOA objected to the submission by BMI counsel of a letter dated May 12, 1980, addressed to the Tribunal with an enclosure listing "background" music rates that BMI asserted it charged its licensees. Unbeknownst to the Tribunal, this letter and enclosure were not served upon the other parties, and the Tribunal was not cognizant of that omission until after it rendered its decision. The letter itself was a response to a request made by the Tribunal on the record during the hearings in the presence of AMOA's counsel. AMOA argues that the first time there was any mention of this letter was in the separate findings, conclusions and opinion of Commissioner James which were filed with the Federal Register on December 31, 1980, and were published on January 5, 1981. See 46 Fed. Reg. 890, 891 nn. 8, 9 (1981). The letter was the subject of AMOA's motion for reconsideration, dated January 26, 1981, which the Tribunal denied on February 5, 1981.
 
 
 59
 AMOA argues that the Commissioner's dissenting opinion relied upon the BMI letter as important evidence in his argument favoring a $130.00 license fee for jukeboxes. AMOA sets forth various ways in which it would have been able to rebut the alleged import of the letter insofar as it contributed to Commissioner James' determination of the $130.00 fee. We note, however, that AMOA does not appear to contend that the letter had any specific direct effect upon the Tribunal's (in contrast to Commissioner James') determination. Apparently, AMOA argues that Commissioner James' dissenting views created some sort of upward bias in the Tribunal's result. See AMOA Brief at 49.
 
 
 60
 We think, however, that any prejudice evident in Commissioner James' opinion and attributable to the letter did not affect the result reached by the Tribunal's majority. The Tribunal's differences with Commissioner James were legal and conceptual in nature. Commissioner James essentially adopted ASCAP's view that the Tribunal was required to set a fee within the range of ASCAP's proof, but the other members of the Tribunal rejected any such limiting effect of the ASCAP analogies. Therefore, we do not believe that prejudice from the BMI letter and enclosure has been demonstrated.
 
 CONCLUSION
 
 61
 Ratemaking is an art, not a science. We believe that the Tribunal did not act either unreasonably or unlawfully by establishing a $50.00 royalty fee which would be implemented in stages and be subject to future inflationary adjustments. The necessity of avoiding disruption within the jukebox industry justified the $50.00 royalty and its phased-in implementation. On the other side of the coin, the Tribunal also recognized that a reasonable fee for 1980 might become so distorted by inflation before the next "scheduled" adjustment that the addition of an automatic inflation factor was necessary to achieve the goal of the Act to provide reasonable remuneration to copyright owners. In summary, we find no fault with the Tribunal's final rule as promulgated. The petition for review is hereby DENIED.
 
 
 62
 Petition for review denied.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 These objectives are:
 (A) To maximize the availability of creative works to the public;
 (B) To afford the copyright owner a fair return for his creative work and the copyright user a fair income under existing economic conditions;
 (C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication;
 (D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.
 17 U.S.C. §§ 801(b)(1)(A)-(D) (Supp. I 1977).
 
 
 [2]
 As noted above, the Act allows a party with a "significant interest" in the jukebox royalty fee to petition for an adjustment of the royalty fee beginning in 1990 "and in each subsequent tenth calendar year thereafter." 17 U.S.C. §§ 804(a)(1) & (a)(1)(C) (Supp. I 1977). Thus the "term" of a rate adopted by the Tribunal is presumably to be ten years
 
 
 [3]
 We recognize that maximum area rates for natural gas, which were approved in the Permian Basin decision, purport to be based upon composite costs for the area in question. The royalty fees set by the Tribunal, to the extent they reflect "marketplace analogies," are based upon value comparisons with arguably comparable fees
 
 
 [4]
 H.R. Rep. No. 1476, 94th Cong., 2d Sess. 179 (1976), U.S. Code Cong. & Admin. News 1976, p. 5795 (emphasis supplied), states:
 The Committee concluded that determinations of the Copyright Royalty Commission were not appropriate subjects for regular review by Congress and that the provisions of the Senate bill providing for judicial review were far too restrictive. Therefore, it amended the Senate bill to eliminate automatic Congressional review and to broaden the scope of judicial review. The amended bill provides for the full scope of judicial review provided by Chapter 7 of the Administrative Procedure Act.
 
 
 [5]
 The Tribunal's regulations governing these "formal hearings," 37 C.F.R. § 301.41(a) (1981), which were followed in this case, provide for published notice of an impending hearing, oral presentation of witnesses and submission of evidence to the Tribunal complete with cross-examination and rebuttal, certification of an official transcript of the hearing, application of various evidentiary rules and principles set out in the regulations, and submission of proposed findings and conclusions to the Tribunal
 
 
 [6]
 We recognize of course that the American Public Gas case was decided under the Natural Gas Act of 1938, 15 U.S.C. § 717r(b), which provides that the finding of the Commission as to the facts, "if supported by substantial evidence, shall be conclusive." The Copyright Revision Act of 1976 has no comparable provision
 
 
 [7]
 See Associated Indus. of N.Y. State, Inc. v. United States Dept. of Labor, 487 F.2d 342, 349-50 (2d Cir. 1973). Although Associated Industries involved informal (i.e., notice-and-comment) rulemaking, we believe the principles articulated there by Judge Friendly are applicable to this case where formal procedures are used. Indeed, Judge Friendly astutely observed that the distinction between the "substantial evidence" and the "arbitrary and capricious" standard may matter only in administrative adjudications where an agency's decision may not be supported by substantial evidence but nonetheless could pass muster under an arguably less rigorous "arbitrary and capricious" standard
 
 
 [8]
 See S. Rep. No. 473, 94th Cong., 1st Sess. 95-99 (1975); H.R. Rep. No. 1476, 94th Cong., 2d Sess. 111-15, 173-79, 347-49 (1976)
 
 
 [9]
 Our approval of an automatic inflation adjustment in 1987 does not conflict with the recent decision in Recording Indus. Ass'n of Amer. v. Copyright Royalty Tribunal, 662 F.2d 1, 14-18 (D.C.Cir.1981) (RIAA ), where the court rejected that portion of the Tribunal's rule which would have allowed the Tribunal to adjust the royalty rate payable for phonorecord manufacture and distribution. The apparently unlawful aspect of the inflation adjustment procedure adopted by the Tribunal in RIAA was that the adjustment was not automatic or tied to an independent indicator (such as the CPI) but instead allowed the Tribunal to recalculate every year at its discretion the royalty rate based on an average price of records. The RIAA court could find no basis in either the Act or its legislative history to permit the Tribunal to undertake each year such an unfettered continuing review of its allegedly final rule regarding the phonorecord royalty. On the other hand, the court noted that a lawful adjustment procedure could be established provided that it was automatic and fixed by formula and was thus beyond the exercise of the Tribunal's discretion. 662 F.2d at 17. The Tribunal's adjustment procedure in the instant case meets these objectives and therefore we believe that whatever applicability the analysis in RIAA (which, in fact, was limited to the phonorecord royalty and did not address the jukebox royalty question) may have here does not require rejection of the Tribunal's 1987 adjustment
 
 
 [10]
 Indeed, the Act excludes jukebox performances in these establishments from the compulsory license provisions since they charge patrons (either directly or indirectly) for admission. See 17 U.S.C. § 116(e)(1)(B) (Supp. I 1977)
 
 
 [11]
 ASCAP also argued, relying on the Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968), that the scope of our review was limited to ascertaining whether the Tribunal's rate fell within this "zone of reasonableness." Although we are without authority to set aside a rate chosen by the Tribunal if it is within the "zone of reasonableness," the Permian Basin case did not hold, as ASCAP/SESAC seems to suggest, that the "zone" is defined solely by the evidence produced by a party at the hearing. Rather, the zone referred to in Permian Basin is the zone defined by the statutory criteria governing the ratemaking. See Permian Basin, 390 U.S. at 767, 88 S.Ct. at 1360; Recording Indus. Ass'n of Amer. v. Copyright Royalty Tribunal, 662 F.2d 1, 9 (D.C.Cir.1981). For the reasons set out in this opinion, we believe the Tribunal lawfully adopted a rate that falls within the zone defined by the criteria of section 801(b)(1) even though it may not fall strictly within the alleged "zone" established by the ASCAP/SESAC evidence
 
 
 [12]
 However, after further consideration of the 1967 legislation, the Senate recommended a fee rate of $8.00 as part of a political compromise. See Second Supplementary Report of Register of Copyrights on the General Revision of the U.S. Copyright Law: 1975 Revision Bill ch. X (1975). See generally S. Rep. No. 473, 94th Cong., 1st Sess. 96-97, 99 (1975)