689 F.2d 1077
 223 U.S.App.D.C. 65, 217 U.S.P.Q. 323,
1982 Copr.L.Dec. P 25,444
 NATIONAL CABLE TELEVISION ASSOCIATION, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent, American Society of
Composers, et al., Intervenors.
AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et
al., Petitioners,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent, National Cable
Television Association, Petitioner.
 Nos. 81-1005, 81-1081.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 21, 1981.
Decided Sept. 10, 1982.
 
 Petitions for Review of Orders of the Copyright Royalty tribunal.
 Stuart F. Feldstein, with whom Brenda L. Fox and Robert St. John Roper, Washington, D. C., on brief, for Nat. Cable Television Ass'n petitioner in No. 81-1005 and intervenor in No. 81-1081.
 Arthur Scheiner with whom John H. Vetne and James J. Popham and Frederick E. Attaway, Washington, D. C. were on the brief for American Society of Composers, et al., petitioners in No. 81-1081 and intervenors in No. 81-1005. Phillip H. Hochberg, Robert A. Garrett and David H. Lloyd, Washington, D. C., also entered appearances for American Society of Composers, et al.
 Howard Scher, Atty., Dept. of Justice with whom Charles F. C. Ruff, U. S. Atty. and William Kanter, Atty., Dept. of Justice, Washington, D. C., on brief, for respondent. Mary A. McReynolds, Attorney, Dept. of Justice, Washington, D. C., also entered an appearance for respondent.
 Before ROBINSON, Chief Judge, BAZELON, Senior Circuit Judge, and WRIGHT, Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 BAZELON, Senior Circuit Judge:
 
 
 1
 Under the Copyright Act of 1976,[1] the creators of programming carried initially by television broadcasters must, on request, grant cable television systems permission to retransmit the material.[2] In exchange for this "compulsory license," cable operators must pay royalty fees which are distributed by the Copyright Royalty Tribunal (Tribunal) to the owners of the copyright in the programming.[3] The Act establishes a formula for determining the royalties for the first four years after its enactment and provides for the Tribunal to review the rate structure at periodic intervals thereafter. This case arises out of the first such rate adjustment proceeding. Both of the principal parties to the proceeding challenge the Tribunal's final decision. Cable television operators, represented by the National Cable Television Association (NCTA), identify a number of alleged errors which they contend led the Tribunal to set the fees too high. On the other hand, several organizations representing the owners of copyrighted programming (referred to collectively as "Copyright Owners")[4] claim the Tribunal made a series of mistakes resulting in fees that are too low. With one minor exception,[5] we affirm the decision of the Tribunal.
 
 I. Background
 A. The Statutory Scheme
 
 2
 The development of cable television, like other advances in the "new media," has heightened the tension between two communications policies grounded in the Constitution-ensuring the protection of intellectual property[6] and encouraging the free flow of information.[7] From its beginnings, cable technology has been used primarily to extend broadcast signals to areas beyond the reach of conventional "over-the-air" facilities.[8] When the Supreme Court decided that such "retransmission" did not violate the Copyright Act of 1909,[9] Congress began a long and difficult struggle to safeguard the interests of program producers while achieving the benefits of the new technology.[10]
 
 
 3
 That struggle culminated in the Copyright Act of 1976 which permitted cable operators to offer "secondary transmission" of copyrighted material carried initially by broadcast stations.[11] The Act's compulsory license enables cable systems to offer subscribers essentially three types of "basic" service:[12] (a) the signals of local stations that are otherwise poorly received, (b) national programming from affiliates of the three commercial networks, regardless of the location of the broadcast station, and (c) non-network or "syndicated," programming originating in a community distant[13] from the cable system.[14] As a result of secondary transmissions, advertisers supporting the first two types of programming reach a larger portion of their intended audience (local and national, respectively). Thus, cable carriage permits the originating station to raise its advertising rates and thereby increase its payments to program producers.[15] The market does not, however, as naturally compensate the owners of syndicated programming initially broadcast in communities remote from the cable system. Such programming is generally sponsored by local advertisers with little or no interest in the distant cable audience.[16]
 
 
 4
 Consequently, the Copyright Act requires cable operators to pay royalties as a function of the "distant signal equivalents" (DSEs) they carry.[17] Since it would be impractical for each cable operator to pay the copyright owners of syndicated programming directly,[18] the Act obliges the operators to pay fees into a royalty pool controlled by the Tribunal which, in turn, determines the appropriate share for different types of copyright owners.[19] The fees are calculated as a percentage of gross receipts from basic subscriber charges, varying according to the number of DSEs carried. Thus, the rates set by the statute for the first four years of payments consist of 0.675% of the cable system's gross receipts from basic services for the first DSE, 0.425% for each of the second through fourth DSE, and .02% for each additional DSE.[20] The Act further provides that cable systems earning less than a set amount of gross receipts pay a flat fee, unadjusted for DSEs, and sets the "gross receipts limitations" applicable to the first four years.[21]
 
 
 5
 The original royalty schedule derived from agreements between representatives of the cable operators and program producers.[22] Congress recognized, however, that changes in the industry and in the national economy, as well as experience with the new scheme, might warrant modifications in the rate structure over time.[23] Accordingly, the Act requires the Tribunal to review the rates beginning on January 1, 1980 and, at the request of a party in interest, every five years thereafter.[24] Section 801(b)(2)(A), which governs the adjustment proceedings, permits the Tribunal to modify the rates so they
 
 
 6
 reflect (i) national monetary inflation or deflation or (ii) changes in the average rates charged cable subscribers for the basic service of providing secondary transmissions to maintain the real constant dollar level of the royalty fee per subscriber which existed as of the date of enactment of this Act ....
 
 
 7
 The statute allows the Tribunal to "consider all factors relating to the maintenance of such level of payments including, as an extenuating factor, whether the cable industry has been restrained by subscriber rate regulating authorities from increasing the rates for the basic service of providing secondary transmissions."[25] Section 801(b)(2)(D) permits the Tribunal to adjust the gross receipt limitations according to similar criteria.[26]
 
 B. The Tribunal's Decision
 
 8
 The Tribunal announced the commencement of the first rate adjustment proceeding on January 2, 1980.[27] In an effort to determine changes in subscriber rates since the Act had taken effect, the Tribunal issued a questionnaire to all the cable operators who had filed royalty account forms with the Copyright Office of the Library of Congress.[28] The questionnaire, prepared in consultation with all interested parties, asked the operators to list their basic service charges as of October 19, 1976, when the statute was enacted, and April 1, 1980. It also inquired about the nature and extent of local rate regulation of the cable systems. After receiving 2251 replies, the Tribunal conducted hearings and reviewed economic studies submitted by NCTA and the Copyright Owners. The Tribunal reviewed further pleadings from the parties and issued its final decision on January 5, 1981.[29]
 
 
 9
 Relying on the Consumer Price Index (CPI), the Tribunal concluded that inflation had exceeded by 21% the increase in subscriber charges from October 19, 1976 to January 1, 1980.[30] Accordingly, the Tribunal raised by that percentage the royalty rates for systems earning more than the amount specified in the gross receipts limitations.[31] The Tribunal declined to adopt a proposed semi-annual adjustment for inflation that would operate until the next modification proceeding in 1985 nor did it accept various other contentions of the parties, raised again on appeal.[32] Finally, the Tribunal decided to raise the gross receipts limitations by 33.81%, the increase in inflation since 1976.[33]
 
 II. Discussion
 
 10
 As noted above, NCTA claims the Tribunal set the rates too high while the Copyright Owners take the equally unsurprising position that the rates chosen were too low. Only the latter's contention that the Tribunal should have adopted a semiannual inflation adjustment merits extended discussion. After considering that issue, we will briefly treat the other arguments made by the parties.
 
 
 11
 A. Semiannual Inflation Adjustment.
 
 
 12
 The Copyright Owners, concerned that inflation would diminish the value of their royalty receipts before the next statutory review proceeding in 1985, asked the Tribunal to adopt an adjustment mechanism that would modify the royalty rates in light of semiannual changes in the CPI. Specifically, the owners proposed that the Tribunal adjust the royalty rates every six months according to the difference between the "current subscriber rate and a current CPI factor."[34] They found authority for such a procedure in the Act's requirement that the Tribunal "maintain the real constant dollar level of the royalty fee per subscriber."[35] The Tribunal rejected the proposal, concluding that its power to change the rates could only be exercised at the five-year intervals contemplated by section 804(a)(2)(A).
 
 
 13
 At the outset, we note that the Tribunal's reading of the Copyright Act constitutes a "contemporaneous construction of a (new) statute by (those) charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."[36] Consequently, we must accord that reading more than the usual deference due an agency's interpretation of its enabling act. Guided by that principle, we find the Tribunal's understanding of its rate-setting authority reasonable and therefore sustain its refusal to adopt an inflation adjustment mechanism.
 
 
 14
 We recently considered a closely-related question of statutory interpretation on review of the Tribunal's adjustment of royalty rates for phonorecords. In Recording Industry Association of America v. Copyright Royalty Tribunal, 662 F.2d 1, 14-18 (D.C.Cir.1981) (RIAA ), the court evaluated the Tribunal's plan to adjust the phonorecord rates each year according to "the change, if any, in the average suggested retail list price of albums" as determined by an annual Tribunal survey of representative records. We concluded that the plan's complexity and expense, as well as its potential to produce litigation, conflicted with "a deliberate congressional intent to limit the Tribunal's exercise of discretion in evaluating economic and other factors relating to the fairness of the royalty rate to the review proceedings provided by the statute." Id. at 16. Since the Act charges the Tribunal with achieving "reasonable" royalty rates for phonorecords,[37] however, we did not require the Tribunal to "set a flat rate that will remain in effect until the next rate determination" for records in 1987:
 
 
 15
 If economic conditions make it implausible that any numerical rate will remain reasonable over the next seven years, then we see nothing in the statute precluding the Tribunal from adopting a reasonable mechanism for automatic rate changes in interim years .... But, whatever the scope of the Tribunal's adjustment powers may be, the mechanism chosen must be well-determined and beyond the Tribunal's discretion, and judicial review of the reasonableness of the chosen mechanism must be available as part of the review of the Tribunal's statutory rate proceeding.
 
 
 16
 Id. at 17.
 
 
 17
 More recently, the Seventh Circuit employed similar reasoning in upholding an automatic inflation adjustment mechanism for jukebox royalty rates. In Amusement and Music Operators Association v. Copyright Royalty Tribunal, 676 F.2d 1144 (7th Cir. 1982) (AMOA ), the court underscored the Tribunal's broad power to assure a "reasonable" rate for jukeboxes[38] as well as the wide range of factors the Tribunal must consider in determining such a rate.[39] Based on these provisions, the court concluded that "a cost of living or other inflation adjustment designed to maintain the real value of the fee set by the Tribunal is not prohibited but is instead affirmatively supported by the language of the Act."[40] The court emphasized that the jukebox adjustment mechanism was "automatic and fixed by formula and ... beyond the exercise of the Tribunal's discretion"; accordingly, the mechanism met the standards established in RIAA.[41]
 
 
 18
 Our conclusion in RIAA "that Congress intended the Tribunal to exercise its discretion to determine royalty rates only at recurring intervals"[42] applies equally to proceedings under the cable sections of the Act. Indeed, we relied in RIAA partly on "the inflexibility of the timetable" established for review of the cable rates.[43] The Copyright Owners deny, however, that their adjustment proposal would require the Tribunal to exercise any discretion between proceedings. They claim the proposal meets the requirements of RIAA and AMOA since it would necessitate only "a mechanical, non-discretionary exercise in arithmetic twice each year."[44] Although the Tribunal and NCTA vigorously contest that characterization of the proposal,[45] we will accept it for the sake of discussion. Nevertheless, in light of certain clear differences between the Tribunal's authority to set cable rates and its jurisdiction over the industries involved in RIAA and AMOA, we cannot conclude that the Tribunal's view that a semiannual adjustment would exceed its powers is "inconsistent with the statutory mandate or that (it) frustrate(s) the policy that Congress sought to implement."[46]
 
 
 19
 The manufacturers of phonorecords and the operators of jukeboxes pay royalties that contrast sharply both in form and in the manner of adjustment with those required of cable users. While the cable provisions key rates to a percentage of gross receipts attributable to use of the copyrighted material, the phonorecord and jukebox sections of the Act set out fixed dollar amounts that must be paid according to the number of "copies" made by the licensee.[47] The initial sums chosen by Congress reflect experience with copyright liability and compulsory licenses in the phonograph area that extends at least to the 1909 Copyright Act.[48] Congress nevertheless recognized that the reasonableness of the rates could change over time and therefore delegated to the Tribunal the essentially legislative task of revisiting them every ten years.[49] Thus, in periodic review of the rates, the Tribunal must determine "reasonable" fees in light of four broad objectives of copyright law.[50] In contrast, the cable provisions permit rate adjustment "solely" for the purpose of maintaining the dollar value of the initial rate schedule.[51]
 
 
 20
 In the face of these differences in its authority to adjust rates, the Tribunal could reasonably conclude that the purpose of the periodic review provisions, and therefore the effect of interim adjustments, varies among the different industries covered by the Act. The wide-ranging nature of the phonorecord and jukebox proceedings, as well as the long history of copyright law for phonographs, apparently led Congress to conclude that rulemakings conducted more frequently than every ten years would be unnecessarily time-consuming and expensive.[52] Since an automatic inflation adjustment does not require reconsideration of the broad policy objectives addressed every ten years, it does not frustrate the purpose of periodic review in those fields.[53] With respect to cable, on the other hand, these concerns seem less acute. In that area, the Tribunal must simply monitor the rate base selected by Congress to see that it keeps pace with inflation. Congress could have easily required the agency to undertake this predominantly ministerial task every year, especially since both inflation and the structure of subscriber charges are likely to change rapidly. Instead, it expressly limited the review to five-year periods. The Tribunal could fairly infer from that directive, then, that semiannual performance of essentially the same assignment would thwart Congress' definitive intent.
 
 
 21
 The legislative history of the Act suggests why Congress may have wished the Tribunal to adjust the cable rates only periodically. The novel problems of law and policy posed by the advent of cable technology were substantially responsible for the long delays that plagued efforts to revise the Copyright Act of 1909.[54] Broadcasters, program producers, and cable operators championed seemingly irreconcilable solutions in struggles that occupied congressional committees and administrative agencies for more than ten years.[55] One consequence of the standoff was a set of Federal Communications Commission regulations that effectively "froze" cable development in major cities for several years.[56] Ultimately, the intervention of the White House produced a "Consensus Agreement" among representatives of the industries and governments involved.[57] That document, which formed the basis for revised FCC rules, included a pledge on the part of its signatories to facilitate new copyright legislation.[58] Disputes over the form and amount of royalties continued, however, for four more years: One side argued that the rates should remain relatively fixed in order to permit the business certainty necessary for development of the young cable industry;[59] the other side contended that frequent adjustments in the rates were required to ensure complete fairness to the copyright owners.[60] The various interests involved did not reach agreement on the structure of the Act until the final hours of the 94th Congress.[61] With the cable deadlock broken, the copyright revision swiftly became law.[62] Thus, the cable provisions reflect "a formula upon which opposing social and political forces have come to rest."[63]
 
 
 22
 Semiannual adjustment of the cable rates, even if derived from an "automatic" mechanism, could disturb the repose achieved by enactment of the legislation. In establishing the structure of the Act, Congress regarded both development of the new technology and equity to the program producers goals of immediate importance.[64] The five-year review provisions reflect an accommodation of these competing interests; they afford the copyright owners rough justice and the cable operators reasonable certainty.[65] A semiannual adjustment might refine the provision of fairness to the owners,[66] but it would inevitably decrease certainty of business planning for the operators. After all, while the direction of the inflation rate can, lamentably, be predicted with some assurance, no such confidence can attend any forecast of the amount of the likely increase. In light of the delicate balance struck by the Act, then, it was reasonable for the Tribunal to conclude that Congress expected the initial schedule of rates-adjusted only quinquennially and imperfectly for the effects of inflation-to form the basis for cable royalties until experience warrants amendment of the statute.[67]
 
 
 23
 B. Other Arguments of the Copyright Owners.
 
 
 24
 1. Change in the data cutoff date. At the outset of the proceeding, the Tribunal requested inflation and subscriber data current to April 1, 1980.[68] On completion of the inquiry, however, the Tribunal announced that it would base its rate calculations on data relevant to January 1, 1980, the date prescribed by the statute for commencement of the rulemaking.[69] The Copyright Owners contest the change in time frame, noting that the royalty adjustments consequently ignore the high rate of inflation that occurred between January and April of 1980. The Tribunal's decision was, however, consistent with its view of the periodic adjustment structure of the cable sections of the Act,[70] permitted uniformity of the data,[71] and violated no explicit or implicit provision of the statute.[72] The parties had an opportunity to challenge the selected cutoff date[73] and the Tribunal adequately explained the reasons for its choice.[74] This essentially procedural decision was reasonable and easily within the CRT's discretion.[75]
 
 
 25
 2. "Tiering" practices. Since royalties constitute a percentage of receipts from charges to cable subscribers, cable service fees that disguise revenue attributable to secondary transmissions could frustrate the scheme. Recognizing this possibility, Congress permitted the Tribunal to consider marketing practices that may unfairly affect the return to the copyright owners of syndicated programs.[76] One such practice, specifically contemplated in the legislative history,[77] consists of manipulation of "tiered" rates. A cable operator who tiers prices offers one rate for basic services-the distant signal importation at issue here-and another, usually higher, rate for "pay" services such as movie and sports channels.[78] Cable systems apparently adopt tiering in order to attract customers with low initial charges in the hope that subscribers will ultimately take the more expensive pay services as well.[79] The Copyright Owners contend that this promotional tool produces a royalty base for distant signal compensation that understates the value of basic service to the cable system.
 
 
 26
 The owners submitted evidence that, according to the Tribunal, "demonstrat(ed) that a large number of applicants for new cable franchises and some established systems are offering tiered basic services, and in a significant number of instances, very low or no-cost basic cable services."[80] Accordingly, they urged the Tribunal to account for tiering in the rate schedule.[81] The Tribunal declined to adopt the proposal. It credited evidence from NCTA that tiering "was virtually non-existent during the 1976-1980 time period under review" as well as NCTA's contention that pay-TV services actually augment the owners' royalty base by attracting new basic subscribers and by making the introduction of cable television to new markets economically feasible.[82] These findings were supported by the evidence and, indeed, not inconsistent with the Copyright Owners' showing.[83] The Tribunal acted reasonably and within its range of discretion in concluding that the evidence did not presently warrant an accommodation for tiering in the rate schedule.
 
 
 27
 C. Arguments of NCTA.
 
 
 28
 1. Royalty estimate in the House Report. In an effort "to maintain the real constant dollar level of royalty fee per subscriber which existed as of the date of enactment of (the) Act," the Tribunal compared the inflation rate to the increase in subscriber charges since 1976. It determined the latter figure by asking registered cable operators to report their service charges as of 1976 and 1980.[84] This evidence revealed that charges had, in fact, lagged considerably behind inflation. The cable interests contend, however, that the Tribunal was bound by an estimate of the 1976 fee in the report of the House Judiciary Committee on the copyright legislation.[85] Since a comparison of current fees with that estimate indicates that royalties have kept pace with inflation,[86] NCTA argues, no rate adjustment was warranted.
 
 
 29
 We can find no fault with the Tribunal's approach. Cable operators did not pay royalties until January 1, 1978, the effective date of the Act. Consequently, the statute requires the Tribunal to estimate what the fee would have been in 1976.[87] The estimate in the House Report, as its context makes clear, was cited simply to show the order of magnitude of likely fees. It represented speculation, "based on projections supplied by the interested parties."[88] The Tribunal's estimate, on the other hand, turned on actual subscriber charges for 1976-as reported by the cable operators themselves. Since royalty fees are a function of subscriber charges,[89] the Tribunal's approach offered a reliable and reasonable method for determining whether the "royalty fee per subscriber" had kept up with inflation since 1976.
 
 
 30
 2. Extenuating factors. The statute grants the Tribunal discretion to "consider all factors relating to the maintenance of (the dollar) level of (royalty) payments."[90] NCTA argues that the Tribunal abused its discretion by failing to consider two such factors that would have called for a smaller rate increase: local rate regulation and the "lifting" effect. The Act specifically permits the Tribunal to evaluate, "as an extenuating factor, whether the cable industry has been restrained by subscriber rate regulating authorities from increasing the rates for the basic service of providing secondary transmissions."[91] NCTA offered evidence of rate restraint on some systems but the Tribunal concluded that the effect on subscriber charges was minimal.[92] That conclusion was amply supported by the record. The evidence showed that the average rate increases of unregulated systems were only three percent higher than those for regulated systems and that 95.6 percent of the published requests for rate increases were granted by regulating authorities.[93]
 
 
 31
 NCTA also asked the Tribunal to account for the alleged "lifting" effect of pay television services. On this theory, the attractions of pay-TV induce a greater number of subscribers to buy basic services and therefore expand the revenue base out of which royalties are drawn.[94] We find no abuse of discretion in the Tribunal's treatment of this claim. NCTA's showing was predominantly anecdotal.[95] In any event, the Tribunal regarded "lifting," to the extent it occurs, as having a countervailing effect to the "tiering" noted by the Copyright Owners.[96]
 
 
 32
 3. Absence of a 1980 adjustment factor. As noted above, the Tribunal calculated the rate adjustment by determining the difference between inflation and the increase in subscriber charges since 1976. NCTA points out that while this measurement reflects the royalty shortfall applicable to 1976 revenues, the rate structure derived from the calculation will be applied beginning in 1980. The cable operators therefore asked the Tribunal to convert the percentage difference to a 1980 base, a suggestion advanced at another point in the proceedings by the Copyright Owners as well.[97] The Tribunal refused, offering in explanation only a non sequitur:
 
 
 33
 (B)ecause the purpose of the adjustments is to maintain the real constant dollar value of the rates and of the gross receipts limitation as of the date of enactment of the statute, the Tribunal did not judge that ... a (1980 adjustment) factor could be applied.[98]
 
 
 34
 On appeal, the Tribunal seeks to illuminate this passage by resort to the familiar and sound requirement that we defer to its ratemaking choices. The quoted language does not, however, convince us that the choice in this instance was informatively made. The purpose of the adjustment proceedings is to ensure that the rates continue to yield a "constant dollar value" despite changes in inflation and subscriber charges. This goal is, however, partly achieved without the intervention of the Tribunal: Royalty fees will retain their dollar value precisely to the extent that subscriber charges rise with inflation. Thus, even without an adjustment, the rates established in the Act would produce fees in 1980 that reflect at least some of the impact of inflation. The Tribunal's approach did not account for this effect. Instead, as the example set out in the margin demonstrates,[99] the Tribunal proceeded as though the new rates needed to account for the difference between inflation and the fees produced by 1976 revenues. Accordingly, this portion of the case must be remanded for the Tribunal to correct or explain its apparent mathematical error.
 
 
 35
 D. The Quality of the Tribunal's Decisionmaking.
 
 
 36
 As we explained in RIAA, and more recently in National Association of Broadcasters v. Copyright Royalty Tribunal, 675 F.2d 367 (D.C.Cir.1982), we must accord substantial deference to the Tribunal's fundamentally legislative effort to set and distribute royalty fees. We appreciate the vigor with which petitioners press their opposing claims; a change in a fraction of a percent in the rates may yield a shift of millions of dollars from one group to another. Nevertheless, both ratemaking and the assessment of technological developments involve choices generally outside the competence or authority of reviewing courts. Mindful of our limitations and finding support for virtually all[100] of the Tribunal's conclusions, we cannot call its decision in this case "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[101]
 
 
 37
 We wish to emphasize, however, that precisely because of the technical and discretionary nature of the Tribunal's work, we must especially insist that it weigh all the relevant considerations and that it set out its conclusions in a form that permits us to determine whether it has exercised its responsibilities lawfully. Courts may not make the judgments entrusted to politically-accountable institutions. They can and must, however, ensure that those judgments provide a basis for popular review by requiring that the choices they reflect are informed by the views of all interested parties and are fully disclosed.[102] In this case, both the Copyright Owners and NCTA have identified several occasions in which the Tribunal explained the basis for its conclusions with less than ideal clarity. In particular, the Tribunal was not always explicit when it rejected evidence proffered by the parties[103] and it left doubt in some instances whether a given decision resulted from a considered policy choice or an understanding of statutory authority.[104] While we do not sanction these lapses, we have regarded them charitably in light of the Tribunal's lack of a professional staff[105] and the novelty of the proceeding. We expect the quality of the Tribunal's decisionmaking to improve with experience.
 
 III. Conclusion
 
 38
 For the foregoing reasons, the case is remanded for the reconsideration described in Part II.C.3 of this opinion and is, in all other respects, affirmed.
 
 
 39
 So ordered.
 
 
 
 [1]
 Pub.L. 94-553, 90 Stat. 2541 (1976) (codified at 17 U.S.C. §§ 101-810 (Supp. III 1979)) (hereinafter referred to as "Act"). All statutory references in this opinion are to sections of 17 U.S.C. unless otherwise noted
 
 
 [2]
 Section 111(c)
 
 
 [3]
 Section 111(d)(2)
 
 
 [4]
 The Copyright Owners include the Motion Picture Association of America, Inc.; the American Society of Composers, Authors, and Publishers; Broadcast Music, Inc.; National Basketball Association; National Hockey League; North American Soccer League; and Major League Baseball
 
 
 [5]
 See pp. 1090-1091 infra
 
 
 [6]
 Article I, section 8 of the Constitution grants Congress power to "promote the Progress of Science and useful Arts by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." As the language suggests, copyright is intended to encourage the development and dissemination of knowledge by providing incentives to creators. See Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975). To this extent, the aims of copyright law are, of course, harmonious with those of the first amendment. On the other hand, the right to control information may include the right to suppress it. In that respect, copyright policy may conflict with some of the purposes of free expression. See Nimmer, Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?, 17 U.C.L.A. L. Rev., 1180 (1970). See also Lee v. Runge, 404 U.S. 887, 887-93, 92 S.Ct. 197, 197-201, 30 L.Ed.2d 169 (1971) (Douglas, J., dissenting from denial of petition for certiorari); Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966) (biography of Howard Hughes); Time, Inc. v. Bernard Geis Associates, 293 F.Supp. 130 (S.D.N.Y.1968) ("Zapruder film" of Kennedy assassination); King v. Mister Maestro, Inc., 224 F.Supp. 101 (S.D.N.Y.1963) (speeches of Martin Luther King). In this regard, it is noteworthy that the government relied in part on copyright law in seeking to prevent publication of the "Pentagon Papers." See B. Kaplan & R. Brown, Cases on Copyright 21 (2d ed. 1974)
 
 
 [7]
 "Congress shall make no law ... abridging the freedom of speech, or of the press ...." U.S. Const., amend. I
 For another illustration of the increased tensions between copyright and free expression produced by new technologies, see Universal City Studios v. Sony Corp. of America, 659 F.2d 963 (9th Cir. 1981).
 
 
 [8]
 See H.R. Rep. No. 1476, 94th Cong., 2d Sess. 88-89 (1976) ("1976 House Report" ); Inquiry into the Economic Relationship Between Television Broadcasting and Cable Television, 71 F.C.C.2d 632, 644-57, 662-63 (1979) ("Economic Inquiry" ); Greene, The Cable Television Provisions of the Revised Copyright Act, 27 Cath. U. L. Rev. 263, 263 n. 3 (1978) ("Cable Television Provisions" )
 
 
 [9]
 Teleprompter Corp. v. CBS, Inc., 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). The Court in these cases concluded that retransmission of television broadcasts did not constitute a "performance" within the meaning of the Copyright Act of 1909. In Teleprompter, the Court specifically noted that "any ultimate resolution of the many sensitive and important problems in this field ... must be left to Congress." 415 U.S. at 414, 94 S.Ct. at 1141
 
 
 [10]
 See pp. 1084-1086 infra
 
 
 [11]
 As to cable systems operating within the continental United States, Hawaii, and Puerto Rico, the Act defines "secondary transmissions" as those occurring simultaneously with the "primary transmission" of the programming. The quoted phrases, as well as "cable systems," "distant signal equivalent" and other relevant terms of art, are defined in section 111(f). See also note 17 infra
 
 
 [12]
 "Basic" service, which consists of secondary transmissions, must be distinguished from "pay" service. The latter, also known as "pay-TV," consists of programs acquired by cable systems directly from copyright holders and resold to subscribers. Today, "pay-TV" consists mainly of motion pictures and sporting events. See generally Home Box Office, Inc. v. FCC, 567 F.2d 9 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)
 
 
 [13]
 A cable system retransmits signals from a distant community when the system is located outside of the local service area of the FCC-licensed television station in that community. Section 111(f). See 47 C.F.R. § 76.5(f) (1981)
 
 
 [14]
 1976 House Report at 88-90
 
 
 [15]
 Id. at 90
 
 
 [16]
 Id.; Cable Television Provisions, 27 Cath. U.L. Rev. at 288 n.106 & 289. It should be noted that empirical research has failed to validate many common assumptions about the economic relationships between broadcasting and cablecasting. See generally Economic Inquiry, supra n. 8; Cable Television Syndicated Program Exclusivity Rules, 71 F.C.C.2d 951 (1979) ("Syndicated Rules" )
 
 
 [17]
 "Distant signal equivalents" are defined in section 111(f). A greater DSE value is assigned independent television stations since they almost exclusively carry nonnetwork programming; a lesser value is assigned to network affiliates since they carry only a limited amount of nonnetwork programming. See also Cable Television Provisions, 27 Cath. U.L. Rev. at 288 & n. 106
 
 
 [18]
 1976 House Report at 89
 
 
 [19]
 Sections 111(c), (d)(2)(A), (d)(5) & 801(b)(3). Cable systems must report revenues to the Register of Copyrights on a semiannual basis. Section 111(d)(2)(A). The royalty rates are based on receipts for each accounting period. See note 21 infra. Distribution follows either agreement among the claimants or hearings conducted by the Tribunal Section 111(d)(5). The first distribution of royalty fees was the subject of National Association of Broadcasters v. Copyright Royalty Tribunal, 675 F.2d 367 (D.C.Cir.1982)
 
 
 [20]
 Section 111(d)(2)(B)
 
 
 [21]
 Section 111(d)(2)(C) & (D). Subsection (C) establishes a flat royalty rate of .05 percent of semiannual gross receipts under $80,000 (but not less than $15). For systems with semiannual receipts between $80,000 and $160,000, subsection (D) establishes flat rates of .05 percent for receipts up to $80,000 and 1 (one) percent of receipts over $80,000. Thus, only systems with semiannual gross receipts above $160,000 are subject to rates based on DSEs. These systems, known as "Form 3" systems, pay about 90 percent of the total fees collected. Joint Appendix (J.A.) 146
 
 
 [22]
 Cable Television Provisions, 27 Cath. U.L. Rev. at 279 & n. 65. See also pp. 1084-1085 infra
 
 
 [23]
 1976 House Report at 90
 
 
 [24]
 Sections 801(b)(2)(A) & 804(a)(1) & (2)(A)
 
 
 [25]
 Section 801(b)(2)(A)
 
 
 [26]
 That section provides:
 The gross receipts limitations established by section 111(d)(2)(C) and (D) shall be adjusted to reflect national monetary inflation or deflation or changes in the average rates charged cable system subscribers for the basic service of providing secondary transmissions to maintain the real constant dollar value of the exemption provided by such section; and the royalty rate specified therein shall not be subject to adjustment; ....
 See also note 21 supra.
 
 
 [27]
 45 Fed. Reg. 63 (1980)
 
 
 [28]
 See 1980 Adjustment of the Royalty Rate for Cable Systems, 46 Fed. Reg. 892, 893 (1981) (rule changes to be codified at 37 C.F.R. pt. 308) ("Tribunal Decision" )
 
 
 [29]
 Id
 
 
 [30]
 Id. at 896-97
 
 
 [31]
 Id
 
 
 [32]
 Id. at 893-97
 
 
 [33]
 Id. at 897
 
 
 [34]
 Id. at 894
 
 
 [35]
 See pp. 1079-1080 supra
 
 
 [36]
 Power Reactor Development Co. v. Int'l Union of Elec., Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), quoting Norwegian Nitrogen Products Co. v. U.S., 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)
 
 
 [37]
 See p. 1083 infra
 
 
 [38]
 See id
 
 
 [39]
 See id
 
 
 [40]
 676 F.2d at 1155
 
 
 [41]
 Id. at n. 9
 
 
 [42]
 662 F.2d at 15
 
 
 [43]
 We stated in RIAA:
 Because the timetable for proceedings is so rigid, it is conceivable that economic changes unforeseen at the time of the most recent rate proceeding could create an unfairness in the royalty rate that could not be rectified until the next rate proceeding. The statute itself demonstrates that Congress recognized and accepted this possibility: the inflexibility of the timetable is highlighted by the narrow provision for additional proceedings to adjust the royalty rate for secondary transmission by cable systems in the event of certain changes in federal regulatory policy. Cable royalty adjustments to reflect national monetary inflation and changes in rates to cable subscribers are permitted only in 1980 and each subsequent fifth calendar year, ... but adjustments in response to amendments to certain Federal Communications Commission rules governing cable operations are permitted whenever the FCC implements such changes (citing section 804(b) ).
 Id.
 
 
 [44]
 Reply Brief at 9
 
 
 [45]
 NCTA argues that an industry-wide adjustment "would require the Tribunal to conduct surveys to establish and determine average subscriber rate increases during the preceding six months" and that it "would require the Tribunal to reopen or conduct further proceedings semiannually to receive and evaluate ... evidence." Reply Brief for NCTA at 10, 12. The Tribunal asserts that the owners' proposed adjustment "would be anything but mechanical; it would require a review proceeding exactly like the one involved in this case." Brief for Tribunal at 27, n. 16. See p. 1084 infra
 
 
 [46]
 Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981)
 
 
 [47]
 Section 115(c)(2) provides that "(w)ith respect to each work embodied in the phonorecord, the royalty shall be either two and three-fourths cents, or one-half of one cent per minute of playing time or fraction thereof, whichever amount is larger." Section 116(b)(1)(A) requires a royalty fee of $8 a year for each registered "coin-operated phonorecord player," or jukebox
 
 
 [48]
 See RIAA, 662 F.2d at 3-5. The royalty fee for jukeboxes in the 1967 Act was the first imposed in American copyright law; the 1909 Act expressly exempted the machines from liability. See AMOA, 676 F.2d at 1146; 1976 House Report at 111-12. Congress had, however, sought to determine an appropriate fee for jukeboxes for nearly 20 years before settling on the figure in the Act. See I Copyright Law Revision: Hearings on H.F. 2223 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 94th Cong., 1st Sess. 380 (statement of Bernard Korman, General Counsel, ASCAP), 398-99 (statement of Albert F. Ciancimino, counsel for SESAC Inc.), 411 (statement of Perry S. Patterson, counsel, Rock-Ola Manufacturing Corp., Rowe Int'l, and Seeburg, Inc.) (1975) ("House Hearings" ); S.Rep.No. 473, 94th Cong., 1st Sess. 96 (1975) ("1975 Senate Report" )
 
 
 [49]
 See RIAA, 662 F.2d at 5; AMOA, 676 F.2d at 1146-1147
 
 
 [50]
 Section 801(b)(1). The section directs the Tribunal to achieve the following objectives:
 (A) To maximize the availability of creative works to the public;
 (B) To afford the copyright owner a fair return for his creative work and the copyright user a fair income under existing economic conditions;
 (C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication;
 (D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.
 
 
 [51]
 Section 801(b)(2)(A)
 The Copyright Owners rely heavily on the mandate of section 801(b)(2)(A) to maintain the value of royalty receipts. Without a semiannual adjustment for inflation, they argue, that value will constantly erode. Thus, the section must imply authority to make such adjustments. A complete answer to this argument lies in the fact that, in another section, the Act explicitly requires the Tribunal to meet the directive of section 801(b)(2)(A) during rate reviews conducted at five-year intervals. Section 804(a)(2)(A). Similarly, the Copyright Owners emphasize the concern expressed in the House Report that "the value of royalty fees paid by cable (should not) be eroded by changes in the value of the dollar." 1976 House Report at 175. On the same page, however, the report makes clear that concern for the effects of inflation prompted the provision for periodic review and that "(t)he time periods when (inflation) adjustments may be made" are those set forth in section 804(a)(2)(A).
 
 
 [52]
 See, e.g., 1976 House Report at 173. See generally RIAA, 662 F.2d at 3-6; AMOA, 676 F.2d at 1155 & n.9
 
 
 [53]
 See pp. 1081-1082 supra
 
 
 [54]
 See 122 Cong. Rec. 31984 (1976) (statement of Rep. Railsback):
 Section 111 primarily covers cable television. The subcommittee completely rewrote this section to reflect a compromise between Motion Picture Association of America and National Cable Television Association, the primary parties of interest. This section has been, by far, the most controversial section of the entire copyright bill and has been the primary reason for the delay in enacting the copyright revision bill.
 See also 1976 House Report at 359 (additional views of Rep. Danielson); Cable Television Provisions, 27 Cath. U.L. Rev. at 279.
 
 
 [55]
 See Cable Television Provisions, 27 Cath. U.L. Rev. at 279. See also I House Hearings at 94 (statement of Abraham Kaminstein, consultant to the Library of Congress)
 
 
 [56]
 Economic Inquiry, 71 F.C.C.2d at 651. See also Malrite T.V. of N.Y. v. FCC, 652 F.2d 1140, 1148 n. 9 (2d Cir. 1981), cert. denied sub nom. NFL v. FCC, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). The "freeze" resulted from the Commission's experimental adoption of a "retransmission consent" regulation whereby cable operators needed to obtain permission from broadcasters before they could retransmit programming. Consent was rarely given. Id
 
 
 [57]
 See Malrite T.V. of N.Y. v. FCC, 652 F.2d 1140, 1144 (2d Cir. 1981), cert. denied sub nom. NFL v. FCC, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982); Cable Television Provisions, 27 Cath. U.L. Rev. at 276; Cable Television Report and Order, App. C, 36 F.C.C.2d 140, 284, 286 (1972) (reproducing full text of "Consensus Agreement"). The effect of the redundantly-named document on efforts to revise the copyright laws is also described in I House Hearings at 435-36 (statement of Ashton R. Hardy, General Counsel, Federal Communications Commission)
 
 
 [58]
 See Cable Television Report and Order, App. C, 36 F.C.C.2d 140, 285 (1972). See also Geller v. FCC, 610 F.2d 973, 974-75 (D.C.Cir.1979) (per curiam). See generally Syndicated Rules, 71 F.C.C.2d at 956-964
 
 
 [59]
 See, e.g., I House Hearings at 484-87 (statement of Rex A. Bradley, Chairman, NCTA: Tribunal review of rates creates business uncertainty that slows cable growth), 598-600 (statement of David O. Wicks, Jr., Becker Communications Associates: same)
 
 
 [60]
 See, e.g., II House Hearings at 708-10, 738-39, 761-62 (statement of Jack Valenti, President, Motion Picture Association of America, Inc.: regular Tribunal adjustments important to maintenance of "reasonable and just" payments to copyright owners)
 
 
 [61]
 Cable Television Provisions, 27 Cath. U.L. Rev. at 279 & n.65. See also note 54 supra
 
 
 [62]
 Cable Television Provisions, 27 Cath. U.L. Rev. at 279
 
 
 [63]
 As the Supreme Court said of the Administrative Procedure Act:
 The Act thus represents a long period of study and strife; it settles long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest.
 Wong Yang Sung v. McGrath, 339 U.S. 33, 40, 70 S.Ct. 445, 449, 94 L.Ed. 616 (1950).
 
 
 [64]
 See, e.g., 122 Cong. Rec. 32009 (1976) (statement of Rep. Danielson):
 Cable has a yet unrealized capability to broaden our horizons and to bring education, information, and entertainment to people everywhere. Surely this is in the public interest and for the public benefit. The copyright laws should not be used to restrict or impair that flow of knowledge.... Remembering that copyright is a property right we must also remember that the owner cannot be deprived of his property without due process of law nor can it be taken for public use without just compensation. This is where the most difficult problems arose in working out the copyright bill. We wished to permit and encourage the broader dissemination of communications through cable while being fair and equitable to the owners and users of copyrighted materials and at the same time protecting the public interest.
 
 
 [65]
 The debates preceding Senate defeat of an amendment that would have shortened the adjustment periods underscore Congress' desire to balance fairness to the owners with certainty for the operators. Most of the statements made in opposition to the amendment concerned the cable provisions of the Act. Senator Abourezk, for instance, said the periodic review provision
 represents a very delicate balance between rates to be paid by cable television and a period for review of the rates .... (I)t is incorrect to suggest that any reduction in the review intervals is a compromise. Rather, it is a compromise that cable is included in ... the review process at all.... (The) royalty tribunal is established to ... insure that the rates continue to be fair and equitable to all parties .... (W)e are talking about fees based on a percentage of gross revenues. As cable television grows, the payments to the copyright owners grow.... What we have here is a balance .... It is a fair and equitable balance for all parties. However, it is a delicate balance, and one that I earnestly hope will not be upset.... I am advised ... that if there is anything less than a 10-year review period following the initial review period, the ability for the cable industry to receive financing will be in jeopardy. They will not be able to obtain financing to continue their expansion at all....
 
 
 [122]
 Cong. Rec. 3822-23 (1976). (In conference, the Senate acceded to the House provision for review every five years, rather than every ten.) See also id. at 3148 (statement of Sen. Thurmond: Act achieves "fair(,) equitable (and) delicate balance for all parties), 3149 (statement of Sen. Morgan: objecting to any effort "to upset (equitable and fair) balance that resulted from 10 years of work"), 3822 (statement of Sen. Goldwater: contending "that the Judiciary Committee, after years of hearings and difficult drafting, has arrived at an equitable balancing of the various interests involved, and (that) we should (not) impose any greater liability on (cable television) than the bill already provides.") (1976); I House Hearings at 451 (statement of Thomas J. Keller, Acting General Counsel, White House Office of Telecommunications Policy: "Our review is that the copyright question has inhibited cable development and has clouded the whole question of the appropriate regulatory approach to cable for so long that there should be a period of stability before controversies arise again in terms of how a new fee schedule ought to be structured."); 1975 Senate Report at 82
 These remarks suggest that the legislative compromise effected a choice as to who should bear the risk that inflation will increase more rapidly than cable revenues between rate reviews. Congress apparently imposed that burden on the copyright owners in order to promote cable services by minimizing uncertainty over its copyright costs. The basic rate schedule selected as part of the compromise, however, presumably reflects some effort to compensate the owners for bearing the risk. See generally Note, Uncertainty Over Adverse Government Action and the Law of Just Compensation, 90 Yale L.J. 1670 (1981).
 
 
 [66]
 In this regard, it should be noted that inflation is likely to be reflected, at least to some extent, in cable subscriber charges and that therefore the copyright owners will receive an "automatic inflation adjustment" without any changes in the rates. See 1976 House Report at 367 (dissenting statement of Rep. Eilberg); Memorandum from the National Cable Television Association, reprinted in I House Hearings at 512. See also p. 1090 infra
 
 
 [67]
 The Tribunal first rejected the proposed adjustment mechanism by resolution of December 11, 1980. The resolution stated:
 That interim inflation adjustments prior to the commencement of the next cable adjustment proceeding are not in accordance with the intent of the relevant cable provisions of the copyright law.
 J.A. 134. In its final decision, the Tribunal elaborated:
 Our authority to adopt interim cost of living adjustments must be judged in each proceeding by reference to the specific statutory provisions. The Congress has chosen to narrowly confine our authority to adjust cable royalty fees to reflect national monetary inflation or deflation or changes in the average rates charged cable subscribers. We concur in the NCTA finding that a "continuous adjustment mechanism would render this periodic review scheme all but meaningless."
 Tribunal Decision, 46 Fed. Reg. at 896.
 
 
 [68]
 Id. at 893
 
 
 [69]
 The Tribunal stated:
 The Tribunal judged that for any adjustment the same time span must be used both for the DSE rates and for the gross receipts limitation ceilings. In its survey the Tribunal solicited information as of April 1, 1980, in order to obtain the most recent information on subscriber rate increases prior to the proceeding. However, the Tribunal's survey cut-off date has no statutory relationship with the gross receipts limitation ceilings and the maintenance of their real constant dollar value. Instead the Tribunal determined that, in order to be consistent, the inflationary adjustment for both DSE rates and gross receipts limitations should be calculated as of January 1, 1980, the date the statute stipulates for the initiation of the proceeding.
 Id. at 896.
 
 
 [70]
 See p. 1085 supra
 
 
 [71]
 See note 69 supra
 
 
 [72]
 In fact, the Tribunal's choice of a cut-off date seems consistent with the Act's directive that proceedings begin on January 1, 1980 and end within one year. Section 804(a)(1) & (e). The Tribunal may complete its task more expeditiously if it closes the period for submission of evidence shortly after the commencement of proceedings
 
 
 [73]
 The Copyright Owners concede as much. Brief at 46 n.17. See J.A. 141. Nor did the change of dates prejudice the owners' presentation of evidence. As the Tribunal points out, information on the CPI, subscriber rates, and extenuating factors through April 1 obviously subsumes the same material current to January 1. Brief for Tribunal at 31-32
 
 
 [74]
 The Copyright Owners seize on the Tribunal's characterization of January 1, 1980 as "the date the statute stipulates for the initiation of the proceeding" in order to argue that the agency may have imposed the cut-off date "based on perceived statutory limits." Brief for Copyright Owners at 47. The Tribunal undoubtedly could have been clearer. We believe, however, that a fair reading of its decision indicates that the cut-off date was chosen as an exercise of discretion. See text at note 68 & note 69 supra. In reviewing this and other passages in the decision, we note that the opinion-unlike those of most administrative agencies-was written by the Commissioners personally and that the Tribunal did not have the benefit of legal assistants or administrative law judges. Brief for Tribunal at 9 & n.6. See 1976 House Report at 174 ("(I)t is expected that the staff will consist only of sufficient clerical personnel to provide one full time secretary for each member and one or two additional employees to meet the needs of the entire Commission. Members of the Commission are expected to perform all professional responsibilities themselves."). But cf. Part D infra
 
 
 [75]
 See 17 U.S.C. § 803(a) (1976); FCC v. Schreiber, 381 U.S. 279, 289-90, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965). See also Permian Basin Area Rate Cases, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968)
 
 
 [76]
 Section 801(b)(2)(A)
 
 
 [77]
 See 1976 House Report at 175:
 Concern was expressed during the hearings on the revision legislation that cable systems may reduce the basic charge for the retransmission of broadcast signals as an inducement for individuals to become subscribers to additional services (e.g., pay-cable). Such a shift of revenue sources would have the effect of understating basic subscriber revenues and would deny copyright owners the level of royalty fees for secondary transmission contemplated by this legislation. Accordingly, such shifts of revenue sources, if they do occur, should be taken into account by the Commission in adjusting the basic rates.
 
 
 [78]
 See Tribunal Decision, 46 Fed. Reg. at 893-94, 895; J.A. 110-12, 156, 158, 219
 
 
 [79]
 See sources cited in note 78 supra
 
 
 [80]
 Tribunal Decision, 46 Fed. Reg. at 893-94
 
 
 [81]
 Id. at 894
 It should be noted that the mere existence of tiering does not necessarily denote unfairness to the owners of syndicated programming. Cable operators presumably adopt the practice to increase net long-term profits. Those profits may, however, come either because tiering reduces copyright costs attributable to basic services, as the owners allege, or because it yields increased revenue attributable to a higher volume of pay-TV subscriptions. In the latter event, private negotiations will produce an appropriate shift of copyright compensation to the suppliers of pay programs.
 
 
 [82]
 Tribunal Decision, 46 Fed. Reg. at 895. It is true, as the Copyright Owners point out, that the Tribunal's entire discussion of the tiering problem appears only in a section labeled "Summary of Evidentiary Positions of the Parties" and not in a separate section detailing factual conclusions. Cf. Amoco Oil Co. v. Environmental Protection Agency, 501 F.2d 722, 736 (D.C.Cir.1974) (emphasizing the difference "between findings and a rambling discussion of evidence"). Nevertheless, as we have noted earlier, we cannot require ideal draftsmanship from the virtually staffless Tribunal. See note 74 supra. A fair reading of the entire opinion indicates that the Tribunal made factual decisions in the "evidentiary" section and drew conclusions of law in the subsequent section entitled "Legal Issues." We are satisfied that "the agency's path may reasonably be discerned." Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), pet. to recall mandate denied, 463 F.2d 268 (D.C.Cir.), cert. denied sub nom. WOH, Inc. v. FCC, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). But cf. Part D infra
 
 
 [83]
 See sources cited in note 78 supra. The owners asserted only "some established systems are offering tiered basic service." Tribunal Decision, 46 Fed. Reg. at 894 (emphasis added)
 
 
 [84]
 See pp. 1080-1081, supra
 
 
 [85]
 The relevant portion of the House Report states that the purpose of the adjustment provisions of the Act is
 to assure that the value of the royalty fee paid by cable systems is not eroded by changes in the value of the dollar or changes in average rates charged cable subscribers. The Committee recognizes, however, that no royalty fees will be paid by cable systems until the legislation is effective on January 1, 1978, and accordingly that the royalty fee per subscriber base calculated at the time of enactment must necessarily constitute an estimated value. In the Committee's view, and based on projections supplied by the interested parties, the total royalties produced under the fee schedule at the time of enactment should approximate $8.7 million.
 1976 House Report at 175. At another point, the report states that "(c) ompared with the present number of cable television subscribers, calculated at 10.8 million, copyright payments under the bill would therefore approximate 81 cents per subscriber per year. The Committee believes that such payments are modest and will not retard the orderly development of the cable television industry or the service it provides to its subscribers." Id. at 91.
 
 
 [86]
 NCTA, using three different calculations methods, contended that the "royalty fee per subscriber" as of January 1, 1980 was either $1.08, $1.09, or $1.10. J.A. 242, 247-48. The difference between those figures and the 81cents estimate in the House Report is at least 33 percent, or about the same as the increase in inflation (33.81 percent) for the same period. NCTA also offered evidence intended to verify the trend in the royalty fee per subscriber. J.A. 173-74, 244-45
 
 
 [87]
 See note 85 supra
 
 
 [88]
 See id
 
 
 [89]
 NCTA contends that revenue from basic services reflects factors in addition to subscriber charges and that therefore the "royalty fee per subscriber" may increase at a higher rate than the charges do standing alone. Brief for NCTA at 19. The Act, however, clearly permits the Tribunal to maintain the value of fees per subscriber by comparing inflation with changes in subscriber charges. See p. 1080 supra. Further evidence that Congress expected such a comparison is found in the proviso in section 801(b)(2)(A):
 Provided, That if the average rates charged cable system subscribers for the basic service of providing secondary transmissions are changed so that the average rates exceed national monetary inflation no change in the rates established by Section 111(d)(2)(B) shall be permitted ....
 
 
 [90]
 Section 801(b)(2)(A)
 
 
 [91]
 Id
 
 
 [92]
 Tribunal Decision, 46 Fed. Reg. at 896
 
 
 [93]
 Id. at 893
 
 
 [94]
 Tribunal Decision, 46 Fed. Reg. at 895
 
 
 [95]
 See, e.g., J.A. 189-90, 200-02
 
 
 [96]
 Tribunal Decision, 46 Fed. Reg. at 895
 
 
 [97]
 See J.A. 171 (testimony of Copyright Owners' economic witness Alexander Korn)
 
 
 [98]
 Tribunal Decision, 46 Fed. Reg. at 896. It is unclear from the quoted language whether the Tribunal chose not to adopt the proposal as a matter of policy or whether it believed the statute prohibited application of such a factor. The Tribunal has offered us no reason to believe that NCTA's proposal is prohibited by the statute; if that is the agency's view, it should, on remand, explain the basis of its interpretation
 
 
 [99]
 NCTA offers the following example. Assuming a royalty rate of two percent, cable systems charging their customers $5.00 for basic services would pay 10cents in fees for each subscriber in 1976. From 1976 to 1980, inflation increased by about 30 percent so the adjusted rates should produce a fee in 1980 of 13cents in order to "maintain the real constant dollar level" of payments (1.3 X 10cents = 13cents). During the same period, subscriber charges increased by about ten percent, to $5.50. The Tribunal increased the rates by the raw difference between inflation (30%) and the rise in charges (10%); it therefore set the new rate at 2.4 percent (1.2 X two percent = 2.4%). Applying the Tribunal's new rate to 1980 subscriber charges results in a royalty fee of 13.2cents rather than the desired 13cents (1.024 X $5.50 = 13.2cents). If, however, the percentage shortfall is converted to a 1980 base, the resulting rate produces the correct fee of 13cents:
 The point can also be described in algebraic terms. Let "A n" represent revenues from subscriber charges in year "n", "r" represent the rate of increase in those revenues from 1976 to 1980, "i" represent the rate of inflation during the same period, and "P n" represent the copyright fee for year "n". If the 1976 royalty rate is two percent of revenues, then P 76 = .02 A 76. The purpose of the adjustment is to ensure that P 80 = (1 k i) .02 A 76. In order to determine the amount by which the rate must change so that the new rate, as applied to A 80, will produce P 80, one must express A 76 in the previous equation in terms of A 80:
 
 
 [100]
 See pp. 1089-1091, supra
 
 
 [101]
 5 U.S.C. § 706(2)(A) (1976). See RIAA, 662 F.2d at 7-8
 
 
 [102]
 See generally Bazelon, Coping with Technology Through the Legal Process, 62 Cornell L. Rev. 817, 822-25, 832 (1977). See also Ethyl Corp. v. EPA, 541 F.2d 1, 66-67 (D.C.Cir.) (en banc) (Bazelon, C. J., concurring), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976)
 
 
 [103]
 See note 82 supra
 
 
 [104]
 See notes 74 & 98 supra
 
 
 [105]
 See note 74 supra